## THOMSON-HOUSTON ELECTRIC CO. v. CAPITOL ELECTRIC CO.
### (READ, Intervener).

### (Circuit Court of Appeals, Sixth Circuit. December 4, 1894.)

### No. 147.

1. PRINCIPAL AND AGENT—FRAUD OF AGENT—NOTICE TO PRINCIPAL.
    D., as agent of R., held $50,000 of her money to invest. He was also treasurer of the C. Co., and, as such, held certain bonds of that company, apportioned by vote of the company among the stockholders, without consideration, and deliverable to them on payment of their stock notes, including $6,000 of such bonds attached to a stock note of his own. D., a few days before his note matured, wrongfully, and without the consent of any officer of the company, took the bonds from his note, and caused one M., an irresponsible person, in consideration of a payment to him of $25, to make a note to D., "trustee," for $3,200, and attach $4,000 of the bonds to it as collateral, upon which note D. advanced, ostensibly to M., but really to himself, $3,200 of R.'s money, with which he paid his stock note. D. afterwards, in settling his account with R., turned over to her the note, without indorsement, and the bonds attached to it as collateral. *Held*, that R. was not chargeable with notice of the facts which D. knew as to the issue of the bonds, since, though her agent, he was, in this transaction, engaged in an attempt to deceive and defraud her, for his own advantage.

2. BONDS—BONA FIDE HOLDER—COLLATERAL SECURITY.
    *Held*, further, that R. was a bona fide holder of the bonds, for value, that she held the legal title thereto, and that she was entitled to the security of the mortgage by which the bonds were secured, to the extent of the principal and interest of the note, notwithstanding any equities of the company arising out of their illegal issue.

3. COLLATERAL SECURITY—TITLE.
    The pledgee of negotiable paper indorsed to him (or delivered to him, if it be payable to bearer) before maturity, and without notice to him of any defect of title, as collateral security for the loan of money, is entitled to hold such paper, to the extent of his loan, with the same immunities as an ordinary holder of commercial paper taken by purchase in good faith, for value, and before maturity; and it is not material whether the evidence of the principal debt be in negotiable form or not.

Appeal from the Circuit Court of the United States for the Middle District of Tennessee.

This was a suit by the Thomson-Houston Electric Company against the Capitol Electric Company for the foreclosure of a mortgage. Martha M. Read filed an intervening petition praying that she might be decreed to be entitled to the security of the mortgage as to four

bonds held by her.    The circuit court dismissed the petition.    56 Fed. 849.    The intervener appeals.

The original bill in this cause was filed to foreclose a mortgage given by the Capitol Electric Company to secure an issue of $100,000 of negotiable bonds, payable to bearer. Martha M. Read, the appellant, intervened, and filed her petition praying the court to decree that four of these bonds, of the par value of $1,000 each, held by her, entitled her to the security of the mortgage, foreclosure of which was being sought. She averred that she did not own the bonds absolutely, but held them as collateral security for the payment of a note for $3,200, signed by one W. W. Morrow, dated July 1, 1890, payable one year from date, to A. Dahlgren, as trustee, which she, as the real owner, had held since the time of its execution. She prayed that her debt might be recognized and allowed, and that she be paid and satisfied out of the assets of the defendant company, together with her reasonable attorney's fees. Her petition was answered by H. M. Doak, the receiver in the cause, appointed by the court and empowered to bring and defend all suits arising out of the settlement of the affairs of the electric company, who averred that the bonds had been put into circulation without the authority of the defendant company, through the fraud of one Dahlgren, an agent of the petitioner, and that she was, therefore, charged with knowledge of their invalidity. The answer further set up that the note which the bonds were pledged to secure was never indorsed to the petitioner, that she, therefore, was not the owner of the legal title either of the note or the bonds, and that all the defenses which could be pleaded by the company against the bonds in the hands of A. Dahlgren were available against the claim of the petitioner. There was no substantial dispute in regard to the facts. A. Dahlgren was the nephew and agent of Mrs. Read, the petitioner, in Nashville. She had given him $50,000 of her money, to lend it on security. He was the secretary and treasurer and general manager of the defendant. the Capitol Electric Company, which was a corporation chartered under the laws of Tennessee, for the purpose of furnishing electric light and power. In the course of the business of the company, a valid mortgage upon its property of every kind was executed to secure a proposed issue of $100,000 of bonds. Fifty thousand dollars of the bonds were used to buy additional property required in the corporate business; the other bonds of the issue. by resolution of January 26, 1890, were distributed without consideration among the stockholders, in proportion to their stock. Dahlgren had subscribed for $15,000 of the original capital stock, and was entitled, under the resolution, to receive $15,000 of the first mortgage bonds when his subscription should be fully paid. By another resolution of April 12, 1890, the secretary apportioned the bonds according to the holding of the stockholders, and attached them, as collateral security, to the notes of the stockholders given for subscriptions. Under this resolution, Dahlgren received $9,000 of the bonds on account of his paid-up subscription, and $6,000 more of them were attached to his stock note as collateral security. About the 1st of July, 1891, he wrongfully, and without the consent or knowledge of any other officer of the corporation, detached the bonds from his subscription notes, and used them in the manner now to be described. One of his subscription stock notes to the company became due about on the 3d of July, for $2,250. He had no money of his own with which to pay it, but he had money of Mrs. Read in his possession. He wished to take her money, and pledge for its repayment $4,000 of the bonds then attached to his stock notes. He did not wish to have his name appear in the transaction as the real borrower. He procured one W. W. Morrow, a traveling salesman in straitened circumstances, by payment to him of $25, to execute the following note and instrument of pledge:

"$3,200.00.                                  Nashville, Tenn., July 1, 1890.

"One year after date, I promise to pay to the order of A. Dahlgren, trustee, thirty-two hundred dollars, at the First National Bank, for value received, with interest from date.                            W. W. Morrow."

**The** foregoing note is indorsed:

"The within note is secured by the pledge and deposit of the following securities, to wit, four bonds of the Capitol Electric Company for $1,000 each, Nos. 81, 82, 83, 84; and the First National Bank, or its assigns, may, after the maturity of this note, sell the same for cash or on time, as it or they may deem best, without notice to other party, and appropriate proceeds to the payment of said note; and, in the event of the above-named securities being more than the amount of this note, the same shall be held to cover any other of my indebtedness to the bank, if the latter shall so select; and, should suit be brought on this paper, I agree to pay an attorney's fee, and all other costs of collection.                                    W. W. Morrow."

The circumstances show that this transaction was completed about the time that Dahlgren used the money of Mrs. Read to pay his note due the defendant the Capitol Electric Company. On August 25th, Dahlgren transmitted to Mrs. Read an account current of his agency or trusteeship covering the period from February 8 to August 20, 1890. In this letter he inclosed the Morrow note, and in the account charged her with the money paid out on the same. The circuit court held that Mrs. Read was not charged with the knowledge of A. Dahlgren as to the wrongful issue of the bonds, because in the transaction he was engaged in an attempt to deceive and mislead her for his own purposes. But the circuit court further held that, as she was only the equitable owner of the note which the bonds were pledged to secure, she had only an equitable title to the bonds, and could not, therefore, enjoy the advantages of a bona fide purchaser for value; that she took the bonds subject to all the equities growing out of their issue; and, as they were admitted to be invalid except in the hands of a bona fide purchaser for value, her petition was dismissed. This is an appeal from the decree dismissing the petition.

Granbery & Marks, for appellant.

Vertrees & Vertrees, for defendants.

Before TAFT, Circuit Judge, and BARR and SEVERENS, District Judges.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

We do not think that, under the circumstances of this case, Mrs. Read can be charged with notice of the facts which Dahlgren knew concerning the issue of these bonds. As a general rule, the principal is held to know all that his agent knows in any transaction in which the agent acts for him. The Distilled Spirits, 11 Wall. 356. This rule is said to be "based on the principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty." Such a presumption cannot be indulged, however, where the facts to be communicated by the agent to the principal would convict the agent of an attempt to deceive and defraud the principal. The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it. In Allen v. Railroad Co., 150 Mass. 206, 22 N. E. 917, the plaintiff bought shares of stock in the defendant railway through a broker who was treasurer of the company. He fraudulently filled a blank certificate, and delivered it to her. It was sought to impute to her the broker's knowledge of the invalidity of

the certificate, in an action by her for damages for refusal to transfer the stock. The court held that this could not be done, because the legal effect of the fraudulent act of the broker was to cheat his principal. See, also, Kennedy v. Green, 3 Mylne & K. 699; Espin v. Pemberton, 3 De Gex & J. 547; Rolland v. Hart, 6 Ch. App. 678; Cave v. Cave, 15 Ch. Div. 639; Kettlewell v. Watson, 21 Ch. Div. 685, 707; Innerarity v. Bank, 139 Mass. 332, 1 N. E. 282; Dillaway v. Butler, 135 Mass. 479; De Kay v. Water Co., 38 N. J. Eq. 158; Frenkel. v. Hudson, 82 Ala. 158, 2 South. 758. Counsel for appellee attempt to distinguish the case at bar from the cases cited by contending that Mrs. Read is seeking to reap the fruits of the fraud committed by Dahlgren, and, if she will have the benefit of his act, she must take it with the burden of his knowledge. If it were true that Dahlgren had used the bonds fraudulently issued for the benefit of Mrs. Read, it would certainly follow that in an action to recover on them she would be charged with knowledge of the methods by which Dahlgren obtained possession of them. But there is nothing in the case to show this to be the fact. It appears that before Dahlgren used the money of Mrs. Read he had drawn the Morrow note, and had abstracted the bonds. His own letter, which is admitted as evidence by consent, shows that he intended the execution of the note and the delivery of the bonds to be contemporaneous with his use of Mrs. Read's money. He paid his stock note on July 3d, and Morrow's note was dated July 1st. When he abstracted the bonds, therefore, he was not taking them for Mrs. Read; he was taking them for himself, so that he might use them to obtain money from Mrs. Read. He was not abstracting them for the benefit of Mrs. Read, any more than for the benefit of any stranger to whom he might have sold them for value. In the delivering of these bonds to Mrs. Read, Dahlgren was actually dealing with her as a purchaser from him, and not as her agent. The case of Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496, has no application. There the treasurer of two corporations was a defaulter in both positions. The defalcations were of long standing. To avoid discovery at the annual settlement of one company, he drew checks of the other and deposited them in the bank account of the one. On subsequent discovery, the question was whether the company whose bank account had been swelled by the checks of the other could retain the deposits as payment to it by its treasurer of his debt. It was held that this could not be done, because the money had been received by it through the sole agency of the man who knew it to be stolen, and could not, therefore, be received without the burden of his knowledge. The corporation parted with nothing for the checks or money received by it. The transaction was one in which the agent was not securing anything from his principal. The benefit secured by the theft moved solely to the principal. There was no adversary relation between the agent and the principal at all. The agent was acting throughout for the benefit of his principal in an attempt to recoup for it an existing loss, and thereby to conceal his own previous thefts.

The second question is whether Mrs. Read is a bona fide holder of these bonds for value. She holds them, under the contract of pledge contained in the indorsement upon the Morrow note, as security for its payment, with the right to sell the same, and appropriate the proceeds to that purpose. The first inquiry must be whether she has, as against Morrow and Dahlgren, any right to hold and use the bonds. As the note was not indorsed, she would have to bring suit on it against Morrow in the name of A. Dahlgren, trustee. Morrow could hardly plead want of consideration, in view of the fact that he received $25 for signing the note, and the circumstances were such that he must have known that Dahlgren expected to use the note to lead some one into believing that it was a real transaction. In other words, he participated with Dahlgren in the scheme to deceive Mrs. Read, and procure from her money on the faith that the note represented a real note, and not a sham. It would seem to be a case for applying the doctrine of estoppel against Morrow. In this view, there is a real debt represented by the Morrow note, upon which Mrs. Read, as the holder of bonds, has the right to apply their proceeds. But let us concede that Morrow could escape personal liability on the note because of want of consideration; still, Mrs. Read could hold the bonds as against him or Dahlgren, and apply them to pay her advances on the note. She could file a bill in equity against them both, and obtain a decretal order of sale and application of the proceeds to repay her. Daniel, Neg. Inst. § 833. Could Morrow be heard to object to this relief? Clearly not, for he never owned the bonds. Could Dahlgren object, even if the bonds were valid and had been his lawful property? Clearly not. His conduct would estop him from claiming any title to them against Mrs. Read, who had parted with money to him on the faith of the bonds. It seems manifest, therefore, that Mrs. Read is a holder of these bonds for value from him from whom she received them. The bonds are payable to bearer. The legal title passes by delivery. It follows that Mrs. Read, who holds them, has the legal title. She acquired them before their maturity. It is conceded that she had no knowledge of the fraud in the issue of the bonds, and was an innocent purchaser. There are thus united in her title to the bonds the essential elements which constitute a bona fide purchaser of negotiable paper according to the law merchant, and the defendant company cannot be permitted to defeat her action on the ground that the bonds were wrongfully put in circulation.

The learned circuit judge in the court below reached a different conclusion. The reasoning upon which he reached it was as follows: Mrs. Read only acquired title to the collateral by virtue of the note which it secured. She took only an equitable title to the note. Therefore, she could take no better title to the collateral, which is only incident to the note. If this be true, then it would follow that if, instead of bonds, the collateral had been promissory notes of the defendant company, duly indorsed to Mrs. Read, she still would have only an equitable title to those notes, though her title would be established by express indorsement; for one who holds bonds payable to bearer has as complete a legal title as he who holds a promissory

note by indorsement. The necessary sequence is that one cannot have the legal title to a negotiable collateral security held to secure a debt, the evidence of which confers upon the holder only the equitable right to its payment. With deference, such a proposition cannot be supported. It is as much as to say that an absolute deed of land made to secure an obligation held by the grantee by equitable title does not confer the legal title to the land on the grantee. No authorities are cited by the circuit judge or by counsel to sustain this view. It is worked out only as the converse of the principle laid down in Carpenter v. Longan, 16 Wall. 271, where it was held that a mortgage was such an incident to the note which it was given by the maker to secure that it passed, without assignment, to the bona fide indorsee of the note for value, as free from equities as the note itself. The learned judge seems to infer from this case that the character of the title, whether legal or equitable, by which the collateral is held, depends solely on the title by which the principal obligation is held. We cannot agree with him. The supreme court, in effect, held that as the note was negotiable in form, and likely to come into the hands of an indorsee for value, who could enforce payment without regard to the equities of the maker, the contract of the mortgage, reasonably construed, was that the mortgaged land could be used to pay the note even when payment should be thus enforced. The mortgage had no existence without the note. An assignment of it without the note was void, while an indorsement of the note carried the equitable title to the mortgage without assignment. The holding was, not that the mortgage was negotiable, but only that its obligation prevented the making of any defense to it not available against the note. The case also shows, what was well established before, that the transfer of the principal debt or obligation carries with it, in equity, the collateral originally pledged to secure it. But it does not establish that, because the principal debt is negotiably indorsed, the collateral does not also need indorsement to pass the legal title. Where, as is the case at bar, the collateral is the obligation of a third person not a party to the principal obligation, if the equitable defenses of the third person are to be destroyed, the note to which he is a party must be duly indorsed to a bona fide holder for value. He cannot be otherwise deprived of his equitable defenses. He is not affected by the fact that his obligation has become the mere incident, as security of another debt. Why should he be? He is only interested in the principal debt to the extent that it furnishes to the holder of his obligation the right to say that he holds it for value. It will not do to say, therefore, that the title to the principal debt and the collateral must always be both equitable or both legal. If they are both in the form of negotiable paper, the title in which each is held depends on the indorsement of each, and on nothing else. Of course, the right to hold the collateral at all depends on the existence of a debt. If nothing is owed by any one on the principal debt, the holder of the collateral becomes only the trustee for him who has the equity of redemption in the collateral. But so long as there is a debt to which the collateral may properly be applied, the character of the title to

the collateral or to the principal debt is determined by the same rules that would govern if the two obligations were not related to each other.    We can cite no authorities upon the point, because no such case seems ever to have been considered before.    We can only reason on general principles.    It is well settled that the pledge of negotiable paper duly indorsed for the payment of a debt is a negotiation of it for value in due course.    Thus, Senator Daniel, in his work on Negotiable Instruments, says (section 834):

"Where the bill or note of a third party payable to order is indorsed as collateral security for a debt contracted at the time of such indorsement, the indorsee is the bona fide holder for value in the usual course of business, and is entitled to protection against equities, offsets, and other defenses available between antecedent parties: provided, of course, that the bill or note transferred as collateral security is itself at the time not overdue.    And the same principle applies where the collateral note is payable to bearer, and is transferred to the creditor by delivery."

Nothing is here said, and the industry of counsel has not furnished a single case, to modify the application of this principle where the principal debt is in the form of an unindorsed negotiable note, or an assigned nonnegotiable obligation.    The learned circuit judge conceded that if this had been a mere advance of money, either by Morrow or Dahlgren, on the faith of the bonds as security, Mrs. Read would have been a bona fide holder for value; but he said that, in the case as it was, Mrs. Read was obliged to trace her title to the bonds through the Morrow note, of which she was only equitable owner, and, as she was not a bona fide purchaser of that against Morrow and Dahlgren, she could not claim to be such with reference to the bonds. The error in this reasoning, as we conceive, is in saying that Mrs. Read traces her title through the Morrow note.    Her title to the bonds depends on the delivery of them to her, her possession of them, and the fact that the bonds are payable to bearer.    The use of the Morrow note is not to prove or trace title.    It is only to show that she acquired for value the title which the delivery, the form of the bond, and her possession establish.    Substitute for the bonds a collateral negotiable note duly indorsed to Mrs. Read by Morrow and Dahlgren, trustee.    Her title she would trace through Dahlgren, trustee, and Morrow, by the indorsement on the collateral note, not by the assignment of the principal note.    The principal note she would have to use to show the consideration for which she acquired the collateral note, but not to show her title.    Her title to the bonds is established in exactly the same way.    The actual tradition or delivery by Dahlgren to her of the bonds payable to bearer conferred upon her the same kind of title, in every way as complete and legal, as the express indorsement of them by Dahlgren to her would have done.

The decree of the circuit court is reversed, and remanded, with instructions to enter a decree allowing Mrs. Read's claim under the mortgage for the principal and interest of the bonds held by her, and for distribution on the same until the principal and interest of the Morrow note are paid.

SEVERENS, District Judge (concurring).    The judges who sat on the former hearing of this cause having differed in opinion, a reargu-

ment was ordered. The cause was again argued before the same judges and myself. As I understand, their difference in opinion no longer continues. The point presented for decision is an interesting one. Its disposition in the court below, where it was carefully considered, and the doubt it has encountered here, where a different conclusion has been reached, show that it is one of some difficulty. The facts are contained in the statement preceding the opinion of the presiding judge. I concur in that opinion, but think it right to state with somewhat more fullness, in some respects, the reasons for my concurrence.

The question to be determined is whether the petitioner, Mrs. Read, is a bona fide holder for value of the four bonds which she holds, in such manner as to entitle her to recover notwithstanding the equities of the defendant company. The defendants say she is not, and allege two reasons for that conclusion: First, because she is affected by the knowledge of the fraudulent abstraction of the bonds possessed by Dahlgren, her agent, who was the principal participator therein; and, second, because, there having been no indorsement of the Morrow note by Dahlgren to Mrs. Read, she is not the legal holder thereof in the commercial sense, but only an assignee, and therefore chargeable with the knowledge of her assignor; that her right to the bonds pledged can rise to no higher plane than her right in the principal obligation, and that it follows she cannot be a bona fide holder, without notice, of the bonds themselves.

As to the first ground, the judge who heard the case in the court below and my associates have all agreed that, in the circumstances of this case, Mrs. Read is not chargeable with the knowledge possessed by Dahlgren. I feel bound to confess, with great deference to their judgments, that this question seems to me more difficult than the other one, to be presently considered; but I am inclined to agree with their view. Dahlgren had deserted his place as agent of Mrs. Read, and had taken up a position opposed to her. There could be no presumption of information of the principal through a channel which was closed, and there are no grounds for an estoppel. True, he also deserted his place as agent for the company, and the company would not be chargeable with his misappropriation of their bonds by reason of his agency. But the bonds were in fact in his possession by the act of the company, and he had the power, though not the right, to put them off upon purchasers. They had once been issued by the company, and had never been paid or canceled, and on paying for his stock they were enforceable by Dahlgren, subject, perhaps, to participation with other creditors, if there were such. Assuming that Dahlgren's relation to the company gave him no more right as against the company to dispose of the bonds than a mere stranger would have, who had access to the bonds by permission of the company, still it would remain that the abstraction and negotiation of the bonds to a bona fide purchaser for value would give a good title to the purchaser in either case. In the present case, therefore, I do not think Dahlgren was acting as the agent of either of the supposed principals, but, having possession of the bonds in-

trusted to him by the defendant company, made the manual abstraction and tradition of them which brought them to the hands of an innocent holder.

Secondly. Is Mrs. Read chargeable with notice because the Morrow note was not indorsed to her, but was assigned, merely? The condition of things was this: Morrow had made his note to Dahlgren, as trustee, or order, for $3,200. To that note he had attached a pledge of those four bonds, payable to bearer at a future date. To make the pledge effectual, Dahlgren must be supposed to have delivered the bonds to Morrow. Dahlgren took $3,200 of Mrs. Read's money, reported it to her as loaned to Morrow, and handed her the Morrow note, without indorsement, and also the pledged bonds, which were payable to bearer, and required no indorsement. To Mrs. Read, however, the transaction was by the conduct of Dahlgren and Morrow made to wear the appearance of an advancement by way of loan to Morrow of $3,200, and the taking of his note for her benefit, though nominally to her trustee, for that amount, with a transfer to her of the bonds as collateral security for the payment of the note. The maker of the note must be treated as under an estoppel to deny that he received the money, or that he was liable therefor on the note. He knew that he was making a note to some person's benefit, for whom the trustee took the bare title. He knew that what was being done necessarily implied that the $3,200 was in the payee's hands as trustee, and so really belonged to the person whose trustee he was. He knew, also, that the owner of the money would suppose that the $3,200 had been delivered to him, Morrow. Indeed, he could not but understand that the purpose of producing that belief was the prime object of the thing he was doing. He knew he did not get that money, but that Dahlgren was paying him $25 for performing his part in putting up the false appearances to the owner of the money. Those appearances were relied upon, as it was expected they would be. It seems to me a perfectly clear case in which to say that Mrs. Read could have brought suit in a court of law against Morrow upon his note in the name of the trustee, that the court would have protected her right to prosecute the suit to a recovery against any interference by Dahlgren, and that Morrow would have been estopped to deny his liability. It is said that she had merely an equitable interest in the note, and this is technically true. It was, however, but a shade off from a strictly legal interest, and the difference is of no substantial importance in the present case.

The fact which is important is that Mrs. Read parted with her money, and received the Morrow note (whether acquiring the legal title therein by indorsement, or only an equitable title by transfer, is a matter of absolute indifference), and received also the four bonds in pledge as collateral security. She became the holder of the bonds as security for her debt. Whatever other means she may have had for its recovery, she undoubtedly had the right to resort to the bonds. She had parted with her money; for its payment she had received, as collateral security, the bonds, before they were due,

and without any notice of anything wrong in their transfer. On that state of facts, I take it to be entirely well settled that she is not affected by the equities of any prior holder of the bonds. See the last proposition affirmed in Goodman v. Simonds, 20 How. 343. In that case the collateral note sued on was pledged, not to secure negotiable paper, but a debt found due from the pledgor upon a settlement between him and his creditor. It was held .that the latter was entitled to recover, notwithstanding the equities between the pledgor and the maker. The doctrine was also affirmed by each of the three justices who delivered opinions in Brooklyn, etc., R. Co. v. National Bank, 102 U. S. 16, which was a suit upon collateral negotiable paper pledged to secure an antecedent debt having no quality of negotiability, and where the suit to recover upon the collateral was sustained against the equities of the maker. And see, also, Pugh v. Durfee, 1 Blatchf. 412, Fed. Cas. No. 11,460; Bank v. Chapin, 8 Metc. (Mass.) 40; Stoddard v. Kimball, 6 Cush. 469; Bank v. Vanderhorst, 32 N. Y. 553; Curtis v. Mohr, 18 Wis. 645. These cases vindicate the right of the holder of the collateral notes to recover, with-. out regard to the character of the debt they were pledged to secure, and show that the real question is whether there is a consideration for the pledge. The bonds are payable to bearer. The actual delivery of them from hand to hand transfers the title to them as absolutely as successive indorsements would have done, had they been payable to order. The proposition that the petitioner's right in respect to the bonds is to be measured by the character of her right in the note they were given to secure, is not sustainable. The bonds are independent securities. The legal title was vested in Mrs. Read. She could recover thereon to the full amount of the bonds, if the maker had no defense against the pledgor, in which case the pledgee would stand as trustee for the securities to the pledgor in respect to the surplus; or, if the maker had a defense against the pledgor, then her right of recovery would be limited to her own debt. And that, as I think, must be the result in this case. This was held in Bank v. Chapin, and Stoddard v. Kimball, above cited, and is stated to be the general rule in Daniel on Negotiable Instruments (section 832a, 3d Ed.).

What I think is the error from which the opposite conclusion is deduced consists in applying the rule which is applicable to nonnegotiable securities to those which are negotiable. In the former case the only quality of negotiability is that which is imparted to them from the nature of the principal debt. In the latter case they stand on their own footing, and retain the attributes of negotiability, though only pledged for a mere debt, which is not negotiable at all. They do not take their character from the debt secured. It is enough that the debt is created or continued, or duties are assumed in regard to the paper pledged, to constitute one a holder for value. If he takes it without notice of any defect, and before its maturity, he may recover according to his interest. As I understand it, this is the well-settled doctrine of commercial law. Among many cases to that effect is that of Bank v. Vanderhorst, above cited, in the New

York court of appeals, where it was expressly decided that parties receiving negotiable paper as collateral security are entitled to be protected as bona fide holders to the same extent and under the same circumstances as parties who become owners of such paper. The suggestion that Morrow pledged the bonds to Dahlgren only for the payment of the note to him or his indorsee, stands upon too narrow ground. Morrow knew, not only from the face of the note, but from the nature of the transaction, that Dahlgren was a mere agent for another who was furnishing the money, and that the principal could compel him to turn over the note, with the securities, to the principal. And Morrow must be held to have contemplated that Dahlgren might do this. When, therefore, he pledged the bonds in security for the note, he must have intended them to be security in the hands of the person entitled to reduce the note to possession, and to intend the transfer to that person for that purpose. The pledge was, in substance, to pay the money represented by the note, and whoever might be or become the owner in law or equity of the debt would, if he was also the legal holder of the bonds, without notice of any defect therein, be entitled to enforce them without regard to any equities which might exist between the original parties. It follows that, in my opinion, the decree should be reversed, and the cause remanded, with directions to enter a decree for the petitioner that she share in the fund in proportion to the amount due upon the bonds, with interest, to the extent of the amount due her upon the Morrow note.