YEISER et al. v. UNITED STATES BOARD & PAPER CO.

(Circuit Court of Appeals, Sixth Circuit. February 12, 1901.)

No. 846.

1. CORPORATIONS—DUTIES AND LIABILITIES OF PROMOTERS—SECRET PROFITS.

Promoters of a corporation, who become stockholders' therein, assume a trust relation to the company and the other stockholders, which binds them to act openly and in good faith in all matters connected with its organization, and the acquiring of the property necessary for the transaction of the business for which it is organized, and they will not be permitted to make a secret profit on the sale of such property to the corporation, at least when by making themselves officers and directors in the initial organization they control the corporation, and assume to act in its behalf in making the purchase.

2. SAME—REMEDY OF CORPORATION.

Two of the defendants obtained an option to purchase a manufacturing plant for $75,000, their purpose being to organize a corporation, to take over and operate the property. Together with the other defendants, whom they associated with them, they organized a corporation, placing the capital stock at $100,000, of which defendants subscribed for $25,000, and elected themselves its directors. The holders of the option made a proposition to sell the property to the corporation for $100,000, which was accepted by the directors, and upon that basis defendants sold stock to others. When sufficient had been sold and paid for to enable the company to make the purchase on the terms agreed upon in the option, the board of directors, which had been changed somewhat in its membership, but was still controlled by defendants, again voted to buy the property for $100,000, and it was purchased by the defendant, who was president of the company, and a deed taken directly from the owners to the company, reciting a consideration of "one dollar and other valuable considerations." By means of cross checks, it was made to appear on the books of the company that defendants had paid for their stock, when in fact it was received as a profit on the transfer of the property. The majority of the stockholders had no knowledge of the price actually paid to the former owner for the property, but supposed it to be $100,000, until after the company had taken possession and was operating the plant, when, on learning the facts, they elected other officers, and the company brought suit against defendants for the cancellation of their stock. *Held*

that, under the circumstances shown, the benefit of the purchase made by the holders of the option inured to the company, regardless of the actual value of the property, and that, since the purchase from them could not be rescinded without great injustice to the company, the cancellation of the stock as prayed for was an appropriate remedy.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

The bill in this cause was filed in the circuit court by the United States Board & Paper Company, the appellee here, for the purpose of obtaining a decree annulling certain certificates of stock in the corporation complainant alleged to have been unlawfully obtained by Browne, Stuart, Bell, Province M. Pogue, and Thomas L. Pogue, the defendants named in the bill, two of whom—Browne, by representation of Yeiser, his administrator, and Stuart—are the present appellants. The bill also prayed for such other and further relief as the nature of the case might require. During the pendency of the suit, Browne has deceased, and, upon the suggestion of his death, the suit was revived as to that defendant by substituting Yeiser, the administrator of his estate. All the defendants, except Bell, against whom the bill was taken as confessed, appeared and answered, denying the material allegations thereof on which the claim to relief was founded. A replication was filed and proofs were taken. Upon final hearing, the court granted the specific relief prayed for in the bill. Two of the defendants only—Yeiser, as administrator, and Stuart—have appealed, the other defendants having declined to join. Details of the material facts are stated in the opinion which follows.

Province M. Pogue and C. B. Matthews, for appellants.
C. M. Thompson and Frank M. Gorman, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge, having made the preceding statement, delivered the opinion of the court.

From the record it appears that in the latter part of June, 1896, the defendants Browne, Stuart, and Bell conceived the project of taking an option to purchase the paper-mill plant of the Leonard Paper-Box Board Company, hereinafter called the "Leonard Company," located at Carthage, Ind., and organizing a company, obtaining stock subscriptions, and with the proceeds of such subscriptions buying the mill for the company at an advanced price, which would enable them to make a considerable profit. With this scheme in view, and for the purpose of carrying it out, Browne and Stuart, on July 17, 1896, after some preliminary negotiations, secured from the president and secretary of the Leonard Company an option to purchase their plant within 90 days for the sum of $75,000. There was no vote of the stockholders or board of directors of that company authorizing the granting of the option. On the 23d day of July, 1896, Browne, Stuart, Bell, Province M. Pogue, and Thomas L. Pogue incorporated the company, with the title of the United States Board & Paper Company, and with a capital of $100,000, under the laws of Indiana, by filing articles of association thereof in the proper office, and the said incorporators adopted by-laws for the company. On the 3d day of August, following, these five persons subscribed, but did not pay, for $25,000 of stock, and, they being thus far the only subscribers for stock, elected each other directors. They constituted the whole board. Bell was authorized by the board to solicit additional subscriptions to the capital stock. Browne and

Stuart submitted a proposition to sell to the company the mill property at Carthage for $100,000, the deed to be made by the Leonard Company. This proposition was accepted by the unanimous vote of the board. A prospectus was prepared by the directors, which, together with the minute book of the proceedings of August 3, 1896, was used by Bell in soliciting subscriptions as evidence of the condition and prospects of the company. It was stated among the great advantages of the company that the business would not have to be delayed for the building of a mill, for the complete strawboard mill of the Leonard Company could be transferred by Browne and Stuart to the company, just organized, for $100,000, and the operation of the mill would go on without interruption; and this, it was said, was a "feature worth alone $50,000 to the stockholders." Equipped with the prospectus and minute book, Bell secured in a few months cash subscriptions for stock to the amount of $45,000. On the 16th day of December, 1896, although the option of July 17, 1896, had been renewed and was still open, Browne and Stuart made a fresh proposition to the Leonard Company to buy the mill property for $40,000 in cash, and $35,000 in the bonds of the new company, secured by mortgage on the property, upon the condition that the latter company should, before the 1st of January following, accept a proposition submitted to it by Browne and Stuart for the sale to it of the same property. This proposition was accepted by the Leonard Company at a meeting of its stockholders. On the 19th day of the same month, all of the subscribers to the additional $45,000 of stock, which had been sold after the meeting of the directors in August, paid in the sums which they had subscribed, each one at that time supposing that the purchase price of the mill which their company was buying was $100,000, except two. One of these persons was Henry C. Yeiser, an intimate personal friend of Browne and Stuart, who had at their request subscribed for $3,500 of the stock, to pay for which they advanced the money. They requested him also to become a director, telling him of the profit they were intending to make out of the sale of the mill to the company, and asked him not to disclose that feature of the transaction to the other directors or stockholders. All this he agreed to. The other of the new stockholders who was aware of the actual price at which the mill was sold was E. N. Hill, who was also a stockholder in the Leonard Company. He was induced by Browne to subscribe for $3,000 of the stock in the new company, upon the agreement that he should have $1,000 of the $25,000 of stock which had been originally subscribed, and should be given employment by the new company. This arrangement with Hill was not known to the other subscribers. On the same 19th day of December, Stuart and the two Messrs. Pogue withdrew from the directory, and Yeiser, J. H. Duncan, and H. M. Wrigley, the latter two being new subscribers, were chosen in their places. Neither Duncan nor Wrigley had any knowledge of the actual price at which the mill was purchased from the Leonard Company, but supposed it was $100,000. On the same day the following resolution, which had been previously prepared, was passed by the new board of directors:

"That whereas, the company is desirous of purchasing the paper-making plant located at Carthage, Indiana, from Browne and Stuart, who have purchased the same from the Leonard Paper-Box Board Co.; and whereas, the directors have made careful examination as to the investment and the conditions of the deed provided for by Browne and Stuart from the Leonard Paper-Box Board Company to the United States Board and Paper Company; and whereas, it is for the best interests of the company to further its business in purchasing the same; therefore be it resolved, that pursuant to the authority vested in us by the articles of incorporation and by-laws of the stockholders, that we purchase said plant, with its good will and appurtenances, for $100,-000. and in payment therefor, pay $65,000 cash, and in payment of the balance that bonds of the company, to the value of $35,000, being seventy bonds, of $500 each, the bonds numbered from one to thirty-five, inclusive, being payable in one year from the date of the execution of the trust mortgage hereinafter referred to, and bonds Nos. 36 to 70, inclusive, being payable in two years after the date of the execution of the trust mortgage, with interest coupons attached, payable semiannually, at the rate of 7 per cent. per annum, be issued and duly signed by the president and secretary, who are hereby authorized, empowered, and directed to sign the same; and be it further resolved, in connection therewith, that the president and secretary execute the trust mortgage deed of the company to Louis Leonard, trustee, of Piqua, Ohio, to secure said issue of bonds, and that the said mortgage deed be given on all real estate of the company situated at Carthage, Indiana."

On the 22d of December, 1896, a deed with full covenants of warranty from the Leonard Company was executed and delivered. This deed recited a consideration of "one dollar and other valuable considerations." The officers of the Leonard Company were requested to allow the deed to recite a consideration of $100,000. But as they objected to this, and those managing the business for the new company were not satisfied to have the consideration stated at $75,000, it was finally concluded to put it as it appears in the deed. On the same day the following transaction took place: Browne and Stuart, to pay for the original stock subscription of themselves and their associates, gave to the United States Board & Paper Company their check on the Equitable National Bank for $25,000, without having the money there to pay for it. Browne, as president of the United States Board & Paper Company, gave that company's check on the same bank to Browne and Stuart for $65,000. To the extent of $25,000, the $65,000 satisfied the check given by Browne and Stuart for their shares, and the remaining $40,000 went through Browne and Stuart to pay the cash part of the purchase price agreed to be paid by Browne and Stuart to the Leonard Company for the mill. A mortgage to secure the bonds was given as contemplated. The result of all this was that Browne and Stuart received from their own company the $25,000 wherewith they paid for their stock subscription, and it is the validity of this stock that is the matter in controversy. Certificates therefor were eventually issued, $8,300 each to Browne and Stuart, $8,200 to Bell, and $100 each to the Messrs. Pogue, the two latter having been concerned as attorneys only for the others in the preparation of the papers used in conducting the business, and standing for directors in the organization of the company, presumably for the parties principally interested. But it is not questioned that all these parties were aware of the facts above referred to, as they transpired. The business of the new company went on, and the stockholders, other than as above

stated, remained in ignorance of the fact that the purchase price of the mill to the Leonard Company was only $75,000. But it was finally discovered, and at a meeting of the stockholders, held shortly afterwards, a resolution was passed directing the bringing of the present suit. Judge Thompson, at the circuit, held, in a well-considered opinion, that the company was entitled to the relief prayed, and we are of opinion that he reached the right conclusion.

It is a well-settled principle of equity that those who participate in bringing about the organization of an incorporated company, and in getting it in condition for transacting the business for which it is organized, assume the obligations of a trust towards the company and those who shall be invited to come into the enterprise as stockholders and share in its fortunes. The latter have the right to rely on the good faith and fair dealing of those who have promoted the company, and to assume that they have not perverted the organization by secret means to the accomplishment of selfish purposes, and the destruction of that equality of right which, in the absence of some known modification, all the shareholders are entitled to enjoy. Indeed, some of the decided cases hold a wider doctrine, and declare that, whether the promoter becomes a stockholder himself or not, he owes a like duty to those who became such, and cannot, by covert manipulation of the company while it is under his control, and without the faculty of acting for itself, take a personal profit from his dealings with it. The recognition of a fiduciary relation in such circumstances is merely for the application of a familiar principle of equity, which fastens a trust upon one who has such power over another and his affairs as to give the former an opportunity to make personal gains in his dealings with them.

The reasons for the enforcement of that principle in such cases as this are obvious. Without it there is nothing to hinder the concoction of schemes which the reports of decisions show are becoming quite too frequent in recent years, during which corporations have so greatly multiplied, whereby one may take an option or conditional contract for the purchase of property, and then turn it over, at a profit to himself, to a corporation to be organized, and be under his own control for a sufficient time to enable him to realize the fruits of his enterprise. Unless the promoter of the company is restrained by the obligations of a duty which prevents him from bringing the consequences which are liable to result to others who may be led into danger, he may practice such schemes with impunity. Of course, these observations do not apply to a case where the corporation, having knowledge of the facts and freedom of action, consents to a contract proposed by another, even though he may be a stockholder or a director. The corporation could not in such case complain, nor could a stockholder, if there had been no actually fraudulent purpose towards him. In the present case, while there is some conflict of testimony in the minor details, there is really no room for dispute in regard to the controlling facts.

It is clear that the purpose to organize a corporation to take the mill property, if it should be purchased, was formed in the begin-

ning. The option to purchase the property was not taken with a view to the use of it by the parties to whom the option was given. The option was renewed and kept alive while the corporation was being organized, and as soon as form was given to the latter, so that it was supposed to be competent to act, and its board of directors had formally accepted the proposition of Browne and Stuart to sell the mill to the company, and all things had been shaped to a definite assurance that the sale to the company would go through, and there were sufficient means secured to pay for it, the bargain with the Leonard Company was closed, and the title to the property was conveyed directly from the Leonard Company to the company which Browne and Stuart and their associates had brought into existence.

When, on August 3, 1896, Browne and Stuart made their proposition to sell the mill to their company, and they and their co-operating associates, acting as the board of directors, accepted it for the company, the company was completely in fetters. While it was made to be a purchaser, it was dominated by the seller. It had no organ for seeing, hearing, or even knowing what was going on. Its whole constituency was engaged in bringing about the sale for the sellers. We have, on several occasions, held that where one who assumes to act as the agent of another in a given transaction is really acting as the agent of a third person, or in behalf of some scheme of his own, his apparent principal, having no knowledge of such alien purpose, is not bound by such pretended agent's acts, nor by any notice or knowledge of facts which such agent had at the time the transaction was going forward. Thomson-Houston Electric Co. v. Capitol Electric Co., 12 C. C. A. 643, 65 Fed. 341; Wilson v. Pauly, 18 C. C. A. 475, 72 Fed. 129, 134; Louisville Trust Co. v. Louisville, N. A. & C. R. Co., 22 C. C. A. 378, 75 Fed. 433, 469. And see Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977; Innerarity v. Bank, 139 Mass. 332, 1 N. E. 282. This rule is supported by still stronger reasons where the principal is in such condition that it can by no possibility either learn the facts or have any judgment to form its own course with regard to them.

The farcical nature of this transaction must have been apparent to the actors, for it was subsequently arranged that it should be confirmed after the cash subscriptions to the stock had been obtained and paid in. Then, three of the directors stepped out, and three new ones were brought in, but the efficiency of the board for consummating the scheme was not thereby affected. Browne and Bell remained, and Yeiser was a nominee of Browne and Stuart, under a pledge of co-operation. Duncan and Wrigley, the other new members, although they had no knowledge of the purpose of the others, and therefore no motive to wrong the corporation, were, from the very fact of their want of knowledge, of no service in defending the interests of the company. It seems probable that Stuart's resignation, at least, was made for the purpose of giving a fairer show to the directorate, and inspiring confidence in the good faith of the transaction. In truth, however, the corporation was still as completely in the hands of the parties who were seeking to sell the mill to it for $100,000 as before. They had a majority

of the board, and could pass the measure whether opposition was made or not. The other two members were new men. They knew of no ground for raising a question, and naturally they would have confidence in the men who had been promoting the enterprise.

And thus, again, when the transaction was finally consummated, the company not only had no notice of the fact, but was helpless to protect itself if it had had such notice, and all of the stockholders who were not in the scheme were still equally ignorant of the fact thus purposely concealed. It is evident that the actors planned that the stockholders should remain ignorant. They not only refrained from communicating any information on the subject themselves, but they framed their prospectus in a way to mislead. They secured a promise of secrecy from Yeiser. They silenced Hill with a premium. They gave their check for the $25,000, which they never paid, and inserted a blinding consideration in the deed from the Leonard Company. The stockholders had visited and examined the mill property at Carthage, and were satisfied with it and the price to be paid. How it should have happened that no one of them should have learned of the price at which it was to be bought on the occasions of these visits, is left a matter for inference.

The cases in which the principle of equity which we have endeavored to state has been declared and illustrated are quite numerous, both in England and in this country. We shall refer to a few of them only. The leading English case is that of Phosphate Co. v. Erlanger, 5 Ch. Div. 73, in the court of appeals; the same case in the house of lords, 3 App. Cas. 1218, the names of the parties being reversed. The facts were that the Baron Erlanger and his associates, who were under his control, purchased, for the purpose of speculation, a lease of the island of Sombrero, on which were phosphate mines, for the sum of £55,000. Having procured the lease to be assigned to one Evans, an agent of Erlanger, they proceeded to organize a company for mining purposes, to which they intended to sell the lease at a large profit. They established a board of directors, consisting of five members, of whom two were out of the country. Of the other three, one was Evans, who held the lease; another was MacDonald, who was a near friend of Erlanger, and to whom Erlanger transferred some stock to qualify him; and the other was Dakin, who was a large stockholder, but who knew nothing of the purpose of selling at a profit. At a meeting of the board of directors, consisting of those last named, a proposition from Erlanger to sell the lease to the company for £110,000 was accepted. A prospectus was issued, which stated, among other things, that the lease of the island had been secured for £110,000, and reciting numerous facts to show the value of the bargain. A large number of subscribers were induced to take and pay for shares in ignorance of the profit which was being made by Erlanger and his associates in selling the lease to the company. The truth eventually leaked out, the board of directors was reconstituted, and the new board was authorized to bring suit to recover the amount of profit which the promoters had made on the sale to the company of the lease, and this was done. There were other facts on which incidental ques-

tions arose, but the foregoing constitute the main case. On the hearing, the bill was dismissed by the vice chancellor, but on appeal the decree was reversed by the unanimous judgment of the court of appeals, and a decree ordered that the contract of purchase be rescinded, and that other incidental relief be granted. The defendants thereupon appealed to the house of lords, where the case was twice argued, the last time before seven of the law lords,—an unusual number,—and the judgment of the court of appeals was confirmed, and the appeal dismissed. The lord chancellor (Lord Cairns) did not concur, because he thought there had been laches in bringing the suit, but all concurred in holding that the company was entitled to the relief if the suit has been seasonably brought. The case was in all its essential particulars like that at bar, and all the principal grounds and reasons for decision which have been raised and argued here were elaborately discussed. The same fact, upon which so much reliance has been placed by the appellants here, existed in that case, namely, that the promoters had already acquired the right to the benefits of their purchase from the former owners, and were in a position to sell their purchase to any one who would buy. Indeed, the defendants in that case had a firmer advantage, for they had actually acquired the property before they formed the company, while here the defendants had not made any purchase, but only made secure the way by which the property could be sold to the company which they proposed to organize, and this difference was a fact much relied upon by Vice Chancellor Malins in the court of first instance. We cannot give space to recite the reasoning of the elaborate judgments given in the case, but the final decision firmly established in England the doctrines which we think it right to apply to the present case. Another case to which we intended more especially to refer is that of Gluckstein v. Barnes [1900] App. Cas. 240, which was also a case in the house of lords. In that case a syndicate was formed to buy certain property and resell it to a company, to be formed for the purpose, of which the directors should be the trustees of the syndicate. These trustees bought up some charges on the property, on which they realized £20,000 for the syndicate. The price of their purchase of the property itself was £140,000, and they sold it to the company, at a time when they were directors, for £180,000. The prospectus showed this, but did not show the profit of the £20,000 made in buying up the charges on the property. This latter fact was concealed from the persons who became stockholders, but, being eventually discovered, suit was brought by the official receiver of the company to recover the £20,000. The suit was sustained by the house of lords, upon the ground that the promoters had been, from the time of their original purchase of the property, acting in a fiduciary relation to the company to which they proposed to convey it, and that the profit belonged to the company; and it was further held that, as the circumstances had rendered it impracticable to rescind, the company might recover the money gained by the promoters. Much emphatic language was used by the law lords in giving judgment in that case. It is sufficient to say that the doctrine of the Erlanger Case was repeated, and the various devices employed in such

schemes were condemned with much energy. Other English cases in which the subject has been discussed, upon facts more or less similar to those of the case we have in hand, are Hichens v. Congreve, 4 Russ. Ch. 562; Beck v. Kantorowicz, 3 Kay & Johns, 230; Gover's Case, 1 Ch. Div. 182; Twycross v. Grant, 2 C. P. Div. 469; Bagnall v. Carlton, 6 Ch. Div. 371; Printing Co. v. Green, 5 Q. B. Div. 109; Mining Co. v. Lewis, 4 C. P. Div. 396; In re Cape Breton Co., 29 Ch. Div. 795; and Ladywell Min. Co. v. Brookes, 35 Ch. Div. 400. They do not differ in the essential principles upon which they were decided, though in some of them the vital fact that the property bought for the purpose was imposed by the promoters upon their company, coerced by themselves to take it at a price yielding them a profit, did not exist, and, of course, the absence of this circumstance led to the exoneration of the promoters.

In this country the courts have accepted the essential principle laid down in the English cases, and hold, with scarcely any variation, to the doctrine that the promoter of a company stands in the relation of a trustee to it and those who become subscribers to its stock, so long as he retains the power of control over it. There is some difference of opinion, as there is in the English cases, in regard to the time when he becomes such promoter, within the meaning and operation of the rule. Some courts are of opinion that he is chargeable with the duties of a trust when he enters upon the execution of the scheme which is intended to result in the transfer of the property to a company to be organized and controlled by him. All, however, agree that he comes within the rule when he begins to organize the company, and that from that time he is bound to deal openly and fairly, and in such a way as that those having independent charge of the company, as well as those who are induced to become subscribers to its stock, may be fully advised of the relation he bears to the property which he proposes to sell, in like manner as one who assumes to act as the agent of another in the purchase of property. We refer to a few of the well-considered cases in this country which support what we regard as the doctrine settled upon sound reasons: Brewster v. Hatch, 122 N. Y. 349, 25 N. E. 505; Land Co. v. Case, 104 Mo. 572, 16 S. W. 390; Hebgen v. Koeffler, 97 Wis. 313, 72 N. W. 745; Oil Co. v. Densmore, 64 Pa. 43; Hayward v. Leeson (Mass.) 57 N. E. 656; Burbank v. Dennis, 101 Cal. 90, 35 Pac. 444; Stove Co. v. Wilcox, 64 Conn. 101, 29 Atl. 303, 25 L. R. A. 90. The particular subject does not seem to have been before the supreme court of the United States for consideration, but there have been at least two decisions at the circuit, and they are in harmony with the views we have expressed. Chandler v. Bacon (C. C.) 30 Fed. 538, per Colt, C. J.; Cortes Co. v. Thannhauser (C. C.) 45 Fed. 730, per Wallace, C. J.

The company, as well as the stockholders, are entitled to the benefit of the independent judgment of the trustee in regard to the value of the property to be purchased, and the price to be paid, as well as its fitness for the intended use. It is said that the property was worth what the company paid for it, and is adapted to the company's requirements. It happens so. But this in no manner affects the

operation of the rule. The benefit of the purchase by Browne and Stuart inured to the company. In the present instance the conveyance was with covenants of warranty by the Leonard Company, and the price which that company received would seriously affect the measure of the liability of the vendors by reason of those covenants.

With regard to the kind of relief which should be awarded, it must be adapted to the situation at the time when it was applied for; that is, when the suit was commenced.

There could not be a rescission without gross injustice to the parties wronged. The business has gone on with the use of the mill. It could not be restored without serious prejudice to the interests of the company. We do not think the defendants have any equity to have it restored. It was the company's money which paid for it. It is quite clear that the defendants did not intend to make the purchase for their own use. The substance of the whole matter is that through their breach of trust they were enabled to get $25,000 of the company's stock without paying for it. It seems to us that a decree annulling their title to it is an appropriate remedy. The decree of the circuit court is affirmed.