# LAS OVAS COMPANY, INCORPORATED *v.* DAVIS.

## DAVIS *v.* LAS OVAS COMPANY, INCORPORATED.

---

CORPORATIONS; DIRECTORS; EQUITY; PARTIES; VENDOR AND PURCHASER; FRAUD.

1. While a director of a corporation may not legally delegate his powers, he may waive notice of meetings of the board, and, after having done so, he is estopped to allege lack of notice.

2. A bill in equity by a corporation to recover from certain of its promoters secret profits made by them will not be dismissed because the other promoters were not made parties, as they are not indispensable parties; especially where the final decree in the suit does not charge the defendants with liability for the profits of the other promoters.

3. Except in the case of indispensable parties, objection for want of parties, to be available, must be made early. (Following *Landram* v. *Jordan,* 25 App. D. C. 299.)

4. Members of a syndicate to purchase property for a corporation to be formed by them stand in a fiduciary relation towards the corporation, and where they make a secret profit on the sale of the property to the corporation, and there are stockholders at the time of its organization with no knowledge of the transaction, a suit is maintainable by the corporation against the promoters, to recover such profits, although they are members of the corporation.

5. Where, in a suit by a corporation against the members of a syndicate which organized it for the purpose of selling land to it, to recover secret profits made by them on the sale of the land, it appears that the defendants invested no money in the venture, and practised deceit upon the complainant, not only will the assessable stock acquired by them in the transaction, and representing their profits, be canceled, but also their promoters' stock, representing the time and labor devoted by them in the inauguration and prosecution of the enterprise.

Nos. 2030 and 2033.   Submitted December 16, 1909.   Decided June 1, 1910.

HEARING on cross appeals by the complainant and the defendants from a decree of the Supreme Court of the District of Columbia, in a suit in equity by a corporation to recover secret profits made by its promoters and organizers in the sale by them of land to the corporation.

*Reversed in part and affirmed in part.*

The COURT in the opinion stated the facts as follows:

These are cross appeals from a decree of the supreme court of the District of Columbia. A bill was filed by the Las Ovas Company, Incorporated, to recover from Norman H. Davis and Charles T. Phillips secret profits made by them in the purchase by said corporation of Cuban land, and to cancel certain shares of the stock of the corporation in the hands of Davis and Phillips.

The trial court found the following facts to be established: "In the latter part of December, 1903, or early in January, 1904, the defendants, Davis and Phillips, secured an option on about 4,000 acres of land in Cuba belonging to Madam Acosta, who was the widow of one Tarafa, for $10,000. The

defendants were at that time residents of Cuba. In December, 1903, Davis and Phillips met Mr. Benjamin Micou in Havana, and told him of this property. Davis, Phillips, and Micou met in Washington in January, 1904. Through the latter, the defendants were introduced to General Reid. The latter became interested in the land project and, as a result of negotiations between the parties, an understanding was reached which was embodied in a memorandum of agreement between the parties, early in February, 1904. The substance of this agreement is that a corporation was to be organized for which Messrs. Phillips and Davis and Messrs. Herbert and Micou were to acquire the tract of land of 4,000 acres already referred to, for the sum of $25,000 and 40 per cent of the stock of the company, the said company to have a capital stock of $150,000, 40 per cent of which, or $60,000 in stock, was to be given to Phillips and Davis and Herbert and Micou as compensation for securing the land, and the preliminary work of getting up and incorporating the company afterwards to be organized; the remainder of the $150,000 of stock, *viz.,* $90,000, was to be disposed of to the subscribers thereto for one third of its face value, or $30,000; $25,000 of this money to go to the purchase of the land, and $5,000 to be used as an expense fund as directed by the company, for the purpose of effecting sales of the lots into which the 4,000 acres should be divided; this $90,000 worth of stock was to be taken by the subscribers at one third of its face value, upon the following terms: one half payable down, and the other half payable if necessary at the end of twelve months from the date of subscription.

"Prior to entering into this agreement, and on the 4th day of February, 1904, Davis, Phillips, and Herbert and Micou, acting through Mr. Micou, had entered into an agreement as follows:

"Whereas there is now under consideration the organization of a corporation to acquire, develop, and dispose of land in Cuba for orange growing and other purposes, and the parties to this agreement, who purpose being stockholders in said corporation, have agreed or will agree with the other proposed

stockholders of said corporation, to acquire for and deliver to
the corporation when organized, for $25,000, some 4,000 acres
in land, part of what is known as the Las Ovas tract in Pinal
del Rio Province, Cuba, and whereas Charles T. Phillips and
Norman H. Davis have an option on this land for $15,000, it is
hereby agreed between Charles T. Phillips and Norman H.
Davis, as parties of the first part, and H. A. Herbert and
Benj. Micou, under the firm name of Herbert & Micou, as
parties of the second part, that any sum in excess of $15,000,
paid for this land by the corporation or the subscribers to its
capital stock, shall be divided as follows: two thirds to be
divided between the two parties of the first part, and one
third to go to the parties of the second part. Should the par-
ties to this contract take stock in the corporation instead of
money, for the whole or any part of the excess over $15,000
to be paid by the corporation for this land, then that such
stock is likewise to be divided two thirds between the parties
of the first part, and one third to the parties of the second part.
Agreed upon this 5th day of February, 1904.

(Signed)

Norman H. Davis.
Chas. T. Phillips.
Herbert & Micou,
By Benj. Micou."

"Subsequently General Reid went to Cuba, made an exami-
nation of property in connection with the defendants, and
the determination was reached to increase the amount of land
to be purchased; and another agreement, dated at Havana on
March 19th, 1904, was signed by Phillips, Davis, Reid, and
Herbert & Micou, partners, by Benjamin Micou. This recites
that the parties last named agree to purchase a tract of land in
Cuba containing 5,000 acres, more or less, the property of the
widow Tarafa; 'that they will acquire this tract of land for
the formation of a company to be organized, for the sum of
$34,000, half cash, and the other half in twelve months, and
40 per cent of the stock of the company to be formed. The
company is to have a capital stock of $150,000, 40 per cent of

which, or $60,000 worth of stock, is to be divided equally between signers of this contract,' *i. e.,* Reid to have $15,000, Herbert & Micou $15,000, Davis $15,000, and Phillips the same amount; the remainder of the $150,000 of stock to be subscribed for by the persons signing the agreement in proportion to the amount of shares subscribed.

"The testimony further shows that this last-named agreement was subsequently modified by adding additional land to be purchased from the widow Tarafa at an increased price of $1,000, making the total purchase price at which the land was turned into the company, $35,000.

"There is no dispute in the testimony that, while the original option which had been obtained by the defendants, Davis and Phillips, had been canceled, they had, at the time this last agreement was entered into, made a contract for the purchase of the property from the widow Tarafa for the sum of $20,000. There is also no contest in the evidence upon the proposition that the transaction was closed upon this basis, namely, a sale by the widow Tarafa to the defendants, Phillips and Davis, for the sum of $20,000, and a resale to the company for the sum of $35,000. This was accomplished in the following manner: The widow Tarafa conveyed the property to one Escalante, who was an employee of the defendants, Phillips and Davis, or at least one of them, the deed to him reciting a consideration of $20,000. The latter in turn made a deed to Mr. Micou, the deed reciting a consideration of $35,000, and Mr. Micou subsequently transferred the property to the company for the same consideration. It does not admit of discussion, from the testimony, that the fact that Phillips and Davis had obtained the property for one price, and turned it over to the company for another, was unknown to General Reid, who furnished substantially all the money for the cash payment upon the property, through his contribution to the capital stock of the company, until some months later when, in Cuba, he examined the deeds, and found the discrepancy in the considerations. It is unnecessary to set out in detail the means used by Phillips and Davis to conceal this fact from General

Reid. Neither denies in his testimony that he did not intend to reveal this fact to General Reid or to the plaintiff."

Of the ninety shares of stock of the company remaining after the distribution of the sixty shares of promoters' stock, General Reid subscribed for thirty-five shares, Phillips for twenty-two, Micou for seventeen, and Davis for ten shares. One Billings was to take the remaining six shares. He, however, asked to be relieved from taking these shares, and Davis, prior to the formation of the petitioner, sold Billings's right of subscription to Dr. S. T. Sowers, representing to the doctor that the cost of the syndicate property was $35,000. Reid and Sowers understood that the amount paid by the latter was to be applied toward the liquidation of the syndicate's indebtedness. As a matter of fact, however, the money thus obtained was appropriated as secret profits, and in no way benefited the petitioner.

Phillips sold ten of the twenty-two assessable shares held by him to outside parties, the petitioner subsequently buying these shares, which it now holds as treasury stock. By procurement of Davis, Reid purchased one half of the twelve remaining shares, Davis taking the other half in some sort of settlement with Phillips. Of the fifteen shares of promoters' stock that went to Herbert & Micou, Herbert was given nine, which he now holds, and Micou six. In addition Micou subscribed for seventeen shares, as above indicated. Upon the representation of Davis that Micou could not pay the assessment of his stock, Reid was induced to purchase twelve of the twenty-three shares, while Davis purchased the remaining eleven shares. When these purchases were made Davis had full knowledge of everything that had been done, while Reid did not.

The court, in a carefully considered opinion, reached the following conclusions:

"1st. The defendants shall severally account for that portion of the secret cash profit which each received, said profit being the difference between the amount paid to the widow Acosta and that paid by plaintiff for the land in question, with interest from the date of the receipt of such profit, less such amounts,

if any, as each may have necessarily paid out in securing said land, or in forming such corporation.

2d. The plaintiff may follow said amounts so received, in so far as they went into the stock of said company, or may have a money judgment therefor, as it may elect. If the election is to follow said profits into said shares, the latter shall be delivered up and canceled.

3d. The defendants will not be required to surrender up for cancelation the shares of stock which they received under the written prospectus or subscription agreement, as promoters' stock.

4th. The cause will be referred to the auditor to ascertain the net amount of secret profits received by each defendant, and the proportion thereof which was invested in the stock of plaintiff now held by either of them." The auditor found Davis to be the holder of forty-nine shares, twenty-two of which he held to be promoters' stock and twenty-seven shares he held to represent secret profits, and that in addition there remained $1546.54 of secret profits to be accounted for in money.

The petitioner excepted to so much of the auditor's report as found Davis to be the holder of seven of the fifteen shares of promoters' stock allotted to Phillips, also from so much of the report as found that the fifteen shares of promoters' stock allotted to Davis are valid shares held by him. Specific grounds for each exception were stated. The defendants excepted because the auditor found Davis to be the owner of twenty-two shares of promoters' stock and twenty-seven assessable shares, instead of twenty-five shares of promoters' stock and twenty-four assessable shares.

The exceptions of both parties were overruled and decree entered in conformity with the auditor's report.

*Mr. J. J. Darlington* for the Las Ovas Company, Incorporated.

*Mr. Samuel Putman* and *Mr. J. K. M. Norton* for Davis and Phillips.

Mr. Justice Robb delivered the opinion of the Court:

We will first consider the errors assigned by the defendants, Davis and Phillips. Their first contention is that the bill should have been dismissed because the suit was not properly authorized. This contention was urged upon the trial court. The record shows that when the resolution authorizing the bringing of the suit was passed, the president of the company and all the members of the board of directors save two, Davis being one, were present, and all save Davis had notice of the meeting. It is urged that, this being a special meeting of the board, Davis should have had notice. Davis, who resided in Cuba, and who was there when this meeting was held, had, before leaving Washington, given Reid a power of attorney to vote for him at meetings of the board of directors, saying that notice of special meetings need not be sent him as he could not come here to attend them. While a director may not legally delegate his powers, we see no reason, especially where he is without the jurisdiction, why he may not waive notice; and having waived notice, as in this case, he is estopped subsequently to allege lack of notice.

The second ground for the dismissal of the bill is the defect of parties, the contention being that Herbert and Micou should have been joined as parties defendant. This contention is without merit. When the suit was instituted, the complainant was without knowledge that Mr. Micou had received anything more than his share of the promoters' stock, and the answer of the defendants did not disclose that he had received anything more. It is nowhere intimated in the record that Mr. Herbert knew, or had reason to know, of his partner's participation in secret profits. Herbert and Micou were not indispensable parties. *Stockton* v. *Anderson,* 40 N. J. Eq. 486, 4 Atl. 642. Except in the case of indispensable parties, the rule is well established that objection for want of parties, to be available, must be made early. *Landram* v. *Jordan,* 25 App. D. C. 299, 300. Moreover, Micou, on the institution of this suit, had parted with his stock, and, since the decree appealed from does

not charge the defendants with liability for the secret profits of Micou, they are in no way prejudiced by the failure to include him as a party.

The last ground for the dismissal of the bill is that the petitioner was not competent to maintain suit for the relief sought. The defendants base this contention upon the opinion in *Old Dominion Copper Min. & Smelting Co.* v. *Lewisohn,* 210 U. S. 206, 52 L. ed. 1025, 28 Sup. Ct. Rep. 634. In that case members of a syndicate acquired properties for the purpose of conveying them, at an excessive valuation, to a corporation they were ·to organize. The new company, composed entirely of themselves, was formed, every incorporator having full knowledge of all the facts.. Thirteen fifteenths of the stock of the company was held by the original incorporators, and two fifteenths subsequently passed into the hands of innocent holders. Thereupon a bill was brought by the corporation against the estate of one of the deceased promoters, who had acted nominally as a vendor to the company of part of the property, but who was really acting for the benefit of all the proposed incorporators, to rescind the sale of that portion of the property, or to recover damages. A demurrer was interposed and sustained by the trial court. The Supreme Court sustained the decree on the ground that, the company having "assented to the transaction with the full knowledge of the facts," its action remained binding on itself after changes in its members and an increase in its capital stock, such changes and increase not affecting its identity. The court said: "The difficulty that meets the petitioner at the outset is that it has assented to the transaction with the full knowledge of the facts. If there had been innocent members at the time of the sale, the fact that there were also guilty ones would not prevent a recovery. Here thirteen fifteenths of the stock had been taken by the syndicate, the corporation was in full life, and had assented to the sale with knowledge of the facts before an outsider joined." From our reading of the decision we think the defendants have misconceived its purport. As we read it, it is a reaffirmation of the doctrine that members of a syndicate to purchase property

for a corporation to be formed by them stand in a fiduciary relation towards that corporation, and that they will not be permitted to make a secret profit on the sale of such property to the corporation. *Yeiser* v. *United States Board & Paper Co.* 52 L.R.A. 724, 46 C. C. A. 567, 107 Fed. 340; *Loudenslager* v. *Woodbury Heights Land Co.* 56 N. J. Eq. 411, 41 Atl. 1115, affirming 55 N. J. Eq. 78, 35 Atl. 436; *Erlanger* v. *New Sombrero Phosphate Co.* L. R. 3 App. Cas. 1218, 6 Eng. Rul. Cas. 777. In the latter case the facts did not differ materially from the facts in the case at bar. There a syndicate entered into an agreement to sell at a profit, to a company to be organized by the sellers; but there were innocent stockholders when the company was organized, and, as the Supreme Court said in its review of the facts in its opinion in the *Lewisohn Case,* supra, "there never was a moment when the company had assented with knowledge of the facts." So here, there never was a moment when the Company, with knowledge of the facts, consented to pay $35,000 for property which it should. have obtained for $20,000. The complainant was, therefore, imposed upon and defrauded, and, we think, entitled to maintain this suit.

We will here consider complainant's assignment of error relating to that part of the decree below allowing the defendant Davis to retain the twenty-two shares of promoters' stock now held by him. In entering upon the consideration of this question, it must be remembered that this is a proceeding in equity, and addressed to the conscience of the court. One of the last things which a court of equity should do is to reward duplicity, or make it possible for those guilty of a .fraud to reap substantial benefit therefrom.

The members of this syndicate engaged therein for the purpose of acquiring and developing land in Cuba. The defendants represented, and Reid supposed, that they were acting in good faith, and advancing their *pro rata* share of the money necessary for the preliminary work of investigation, and later towards their *pro rata* share of the amount of the purchase money of the property acquired. Instead of acting in good

faith, as their fiduciary relation especially demanded, they deceived and defrauded complainant, by requiring it to pay $35,000 for property which had really cost but $20,000. Instead of advancing in good faith the *pro rata* amounts required of them in the legitimate prosecution of the enterprise, they advanced nothing, and, by the before-mentioned fraudulent methods, obtained assessable stock of the complainant. This the court has rightly ordered canceled. Can it be possible that equity demands that the promoters' stock which these men procured under the conditions mentioned, and which is now in the possession of one of the guilty parties, and burdened with all the evidences of the fraud, should escape the condemnation of the court? As we view this record the fraud of these parties taints the entire proceeding. There never was a moment, according to the record, when they really intended to invest a dollar in the enterprise. To be sure they devoted some time to the project, but their good faith was at no time apparent. The theory upon which the assessable stock has been ordered to be surrendered and canceled is that it represents secret profits derived from the complainant. What does the promoters' stock now in the hands of Davis represent? It was acquired upon the theory that the members of the syndicate, having in good faith devoted their time and invested their money in inaugurating and prosecuting the enterprise, were entitled to special consideration by reason thereof. Instead of acting in good faith, the defendants practised deceit upon the complainant, which, we think, is of such a nature and so closely related to the question now under consideration, as not to justify a court of equity in distinguishing between the two kinds of stock. Of course it was necessary for some one, if this property was to be acquired, to furnish the money. The defendants not only did not furnish any, but in addition to all the stock which they acquired there still remains in their hands over $15,000 secret profits. Can it be that such a betrayal of trust should be rewarded by recognizing the validity of the promoters' stock thus acquired? Can it be that in a court of equity such gross breach of trust as these men have been guilty

of is to be rewarded to such an extent? The assessable stock which has been ordered canceled represented the fruits of a fraudulent conception, and yet, but for the fraud practised upon the complainant, the defendants would not have received·the promoters' stock. It is evident that they received that stock because it was then supposed that they were honestly acting in the interests of the complainant, and assuming their share of the burdens arising. Had it been known that they were not acting in good faith, and that they were not investing a dollar in the enterprise, it is evident that they would have received no promoters' stock, for they had earned none. As the matter stands, therefore, the twenty-two shares of promoters' stock, which the decree below has awarded the defendants, represents remuneration for faithful and honest services freed from all taint of fraud. We are unable to concur in this result. In our view this stock is entitled to no greater consideration than the assessable stock. The character of the profit realized by the defendants cannot purify its source. Their deceit should avail them nothing at the expense of the party defrauded.

The decree will therefore be reversed in part, with costs to the appellant in No. 2030, and the cause remanded with directions to enter a decree in conformity with this opinion.

*Reversed in part.*