COMMONWEALTH S. S. CO. v. AMERICAN SHIPBUILDING CO.
(three cases).

(District Court, N. D. Ohio, E. D.    June 24, 1912.)

Nos. 8,210, 8,214, 8,215.

CORPORATIONS (§ 448*)—CONTRACTS BY PROMOTERS—ASSUMPTION BY CORPORATION—RIGHT OF RESCISSION FOR FRAUD.

Certain persons, after obtaining an option for the construction of a steamship by a shipbuilding company for a price named, issued a prospectus inviting subscriptions to the stock of a corporation to be formed for owning and operating the vessel, and on securing a sufficient number of subscriptions made a contract for the vessel as trustees, which they turned over to the corporation on its organization. *Held*, that they were promoters and occupied a fiduciary relation to the corporation both before and after its organization, and in the matter of the contract were trustees for the corporation and not for the stock subscribers individually, and that where they were in control of the corporation when the contract was assumed and made a personal profit out of the transaction by receiving a secret commission from the shipbuilding company, of which the other stockholders had no knowledge, the fraud was one affecting the corporation, and the latter, on its discovery, had a right of action to rescind the contract with the shipbuilding company, which paid the commission with full knowledge of the situation and in accordance with an agreement made when the original option was given.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1709, 1789–1792; Dec. Dig. § 448.*

Acts of corporators and promoters, see notes to Yeiser v. United States Board & Paper Co., 46 C. C. A. 576; El Cajon Portland Cement Co. v. Robert F. Wentz Engineering Co., 92 C. C. A. 450.]

In Equity. Suits by the Commonwealth Steamship Company against the American Shipbuilding Company. On final hearing. Decree for complainant.

See, also, 197 Fed. 780.

Statement of Facts—8,210.

It appears from the record in this case that William A. Hawgood and Arthur H. Hawgood were brothers; that they had been in the vessel business in Cleveland for a number of years; that together with another brother, Henry A. Hawgood, prior to 1905, they had organized vessel companies and had had various transactions with the American Shipbuilding Company; that William A. Hawgood and Arthur H. Hawgood had known James C. Wallace, the president of the American Shipbuilding Company, for at least 15 years; that, prior to the transactions complained of in this suit, William A. Hawgood and Arthur H. Hawgood had planned to secure options on vessels from the American Shipbuilding Company, later to form corporations, which corporations would later acquire the boats so to be built; that in those transactions they secured commissions from the American Shipbuilding Com-

pany, which were not made known to the others concerned; that before March, 1905, Arthur H. Hawgood and William A. Hawgood had some conferences with the American Shipbuilding Company concerning the price to be placed upon a boat to be built by the Shipbuilding Company, and to be known as the "Abraham Stearn"; that they later conferred with one Sheldon Parks and planned a prospectus, which provided in substance that a company known as the Commonwealth Steamship Company was to be incorporated under the laws of the state of Ohio, to acquire and operate a steel lake freighter, that bonds and stock would be issued, that William A. Hawgood and Arthur H. Hawgood would be the agents for the company, and that the steamer would be built by the American Shipbuilding Company, ·the steamer to be modern and fully equipped and in all details a proper boat for the efficient handling of cargoes on the Great Lakes.   The contemplated prospectus then recited the history of the vessel trade on the Lakes for some years past, and recited that an option had been given by the American Shipbuilding Company to William A. Hawgood and Arthur H. Hawgood of Cleveland, Ohio, to build this boat at a cost of $385,000.
. Following the prospectus was the following writing:

### "Subscription Agreement.

"Each subscriber hereunder agrees to take and pay for, at the price and in the manner hereinafter stated, the number of shares opposite his signature hereto of the full-paid stock of the Commonwealth Steamship Company. The price is to be one hundred ($100.00) dollars in cash for each share of such stock, and is to be paid to W. A. Hawgood & Co. in the following manner:

"Ten per cent. of the subscription when contract for ship is signed and the balance of the subscription in installments of not to exceed eighteen per cent.   Each within ten days after notice calling for such payment shall be delivered or mailed to such subscriber by said W. A. Hawgood & Co.

"This agreement may be executed in separate writings with the same effect as if all signatures were on one writing and shall bind and benefit the personal representatives and assigns of all parties."

Sheldon Parks had been associated with the Hawgoods for some years in the sale of stock in various companies which had been planned by the Hawgoods, and he assisted, it is quite evident, in planning the prospectus referred to in the record.

In June, 1905, W. A. Hawgood, Arthur H. Hawgood, and Sheldon Parks held a conference and decided to enter into the venture, practically along the lines set forth in the prospectus.   It was decided that the boat should be called the "Abraham Stearn," and that William A. Hawgood and Arthur H. Hawgood should receive for their services in securing from the American Shipbuilding Company the option and the contract for a vessel and collecting the money and seeing that the vessel was built according to contract, the sum of $5,000.

On or about July 1, 1905, James C. Wallace, William A. Hawgood, and Arthur H. Hawgood held a conference at the Hawgoods' office, at which conference they came to an understanding that the American Shipbuilding Company should give William A. Hawgood and Arthur H. Hawgood an option on the vessel to be known as the "Abraham Stearn" to be built at the price of $385,000, and that the Shipbuilding Company should pay to them a commission of $15,000.   On July 1, 1905, the written option was given.   From that date until the middle of August of the same year, Arthur H. Hawgood, William A. Hawgood, and Sheldon Parks, and other persons, secured signatures to the paper which had been referred to as attached to the prospectus.   During this period of time a number of prospectuses were given to the public with the so-called subscription agreements attached to them, and between these dates various persons attached their signatures to these papers, providing for the payment of the aggregate sum of some $200,000, and on August 16, 1905, William A. Hawgood and Arthur H. Hawgood, as trustees, entered into the contract with the American Shipbuilding Company for the construction of the steamer Abraham Stearn.   It appears that the Hawgoods explained to James C. Wallace that they were organizing the Commonwealth

Steamship Company and that this company was to own the "Abraham Stearn." Between August 16 and August 31, 1905, W. A. Hawgood & Co. issued a call for payments from the signers of the so-called subscription agreement. The first payment to the American Shipbuilding Company was made August 31, 1905, by William A. Hawgood and Arthur H. Hawgood, trustees. At the same time the American Shipbuilding Company gave its checks to Arthur H. Hawgood and William A. Hawgood each in the sum of $7,500. The receipt of these payments was not recorded by the Hawgoods.

Following these transactions several other undertakings of a similar nature were entered into between the Hawgoods and the American Shipbuilding Company. They involved the construction of the steamer H. B. Smith, the J. Q. Riddle, and other steamers. Between October, 1905, and November, 1905, the steamers H. B. Smith and J. Q. Riddle were constructed, and on these transactions the Hawgoods received sums of money from the American Shipbuilding Company, paid as commissions.

On November 8, 1905, the Commonwealth Steamship Company was incorporated, with H. A. Hawgood, W. A. Hawgood, Arthur H. Hawgood, Sheldon Parks, and one other as the incorporators. At the time the company was incorporated, the so-called subscription agreements were signed by from 70 to 80 persons. On November 22d a board of directors was elected, consisting of six persons, namely, W. A. Hawgood, H. A. Hawgood, J. Q. Riddle, Sheldon Parks, Arthur H. Hawgood, and Abraham Stearn, and the following officers were elected: H. A. Hawgood, president; William A. Hawgood, vice president; Arthur H. Hawgood, secretary and treasurer; and William A. Hawgood, manager.

The original subscribers to the stock of the company, as appears in the record of the corporation, consisted of: Sheldon Parks, 100 shares; Arthur H. Hawgood, 100 shares; Abraham Stearn, 100 shares; W. A. Hawgood, 100 shares; and J. Q. Riddle, 50 shares.

At said meeting of November 22d a resolution was passed to pay William A. Hawgood and Arthur H. Hawgood $5,500, and to pay Sheldon Parks and others various sums of money. The resolution mentioned in part that the Hawgoods secured the steamer for $10,000 less than it could now be purchased, and had otherwise carefully guarded the company's interests. At this same meeting the officers of the company were directed to make calls for the amounts subscribed for by the signers to the so-called subscription agreements. Prior to the incorporation of the Commonwealth Steamship Company, two calls were made and two payments made to the American Shipbuilding Company; but after the organization of the company, four calls were made and four payments made to the American Shipbuilding Company. Later, in January, 1906, arrangements were made for the issuance of $190,000 of bonds. These bonds were later issued, and on April 20, 1906, the steamer Abraham Stearn was delivered to the Commonwealth Steamship Company.

From November, 1905, to April, 1906, the Hawgoods filled the offices to which they were elected, and in April, 1906, Henry A. Hawgood died, and from that time until February 1911, William A. Hawgood was president, Abraham Stearn, vice president, Arthur H. Hawgood, secretary and treasurer, and William A. Hawgood, manager. During this period of time the Hawgoods held a sufficient number of proxies to control the policy of the company.

At a meeting of the company on January 14, 1911, the statement was made that certain stockholders had information that William A. Hawgood and Arthur H. Hawgood had received a commission in connection with the building of a vessel. This was denied by both of these gentlemen. On February 9, 1911, the number of the directors was increased to 21, and the Hawgoods ceased to be executive officers of the company. On April 7, 1911, the capital stock of the company was increased. From this time up to August 3, 1911, there were rumors that the Hawgoods had received a commission, and some conferences along this line were had by parties interested; but no action was taken by the company, nor does it appear that this fact was officially communicated to the company. On August 3, 1911, a stockholder commenced a

suit against the Hawgoods for an accounting growing out of the payment of certain commissions, and on September 5, 1911, the deposition of James C. Wallace was taken in this suit, which was brought by the stockholders, and known as the "Whitney Case," filed in the common pleas court of Cuyahoga county, in which James C. Wallace testified, in substance, that he did not know whether any payments were made by the American Shipbuilding Company to either Arthur H. Hawgood or William A. Hawgood or William A. Hawgood & Co. He also testified that he could not find certain records and documents, and that he did not think they were in existence. Jt appears in the record, by the testimony of R. C. Wetmore, connected with the American Shipbuilding Company, that certain of these documents and papers asked for from Mr. Wallace were taken to the general counsel of the company and sent to Chicago.

On September 12, 1911, the board of directors of the Commonwealth Steamship Company adopted a resolution requesting the resignation of the Hawgoods. On September 18, 1911, the steamer Abraham Stearn was tendered back to the American Shipbuilding Company, and on September 21, 1911, this suit was commenced.

It further appears from the record that the Abraham Stearn was operated during the years 1906, 1907, 1908, 1909, and 1910, and that it was managed with reasonable care and prudence, and that it at all times had been well used and carefully cared for.

### Statement of Facts—8,214.

The facts in this case are quite similar to the facts in No. 8,210. William A. Hawgood, Arthur H. Hawgood, and Sheldon Parks planned the transactions to some extent as early as September, 1905. It was agreed between these individuals that $15,000 was to be paid out of the first net earnings of the corporation, when formed, as compensation to the Hawgoods for their services in procuring the option, making the contract, collecting and disbursing funds, and superintending the construction, and as compensation to Parks and other persons, for procuring subscriptions to stock. The option letter was dated May 16, 1906, addressed to William A. Hawgood. In this letter the defendant offered to furnish for William A. Hawgood and associates a certain steamer for the sum of $410,000, $200,000 of which was to be paid in monthly installments during the construction, and $210,000 in 10-year bonds dated April 1, 1907; the bonds to be payable one-tenth each year, beginning January 1, 1909; some of the prospectuses to which the so-called subscription agreements were attached, similar in form to those employed in No. 8,210, containing the statement that the price of the boat was $410,000. Other prospectuses stated that the Cuyahoga Steamship Company was to acquire and operate a freighter to cost $410,000. The prospectuses, as before stated, were very similar to those employed in No. 8,210.

At about the time this option was signed, James C. Wallace, president of the defendant company, agreed to pay William A. Hawgood and Arthur H. Hawgood a commission of $25,000, when they procured a contract for a ship on the terms named in the option. Between May 16 and June 16, 1906, additional signers were obtained to the so-called subscription agreement, and on June 16, 1906, the contract for the construction of the steamer was executed by the American Shipbuilding Company, and William A. Hawgood and Arthur H. Hawgood, trustees, and was in accordance with the terms of the option. William A. Hawgood & Co. then made the first call for 10 per cent. of the subscriptions. On July 11, 1906, the Hawgoods made the first payment of $17,500 to the American Shipbuilding Company. At this time there had been paid in on the subscription the sum of $17,480. On the same day the American Shipbuilding Company paid William A. Hawgood and Arthur H. Hawgood $12,500, each by New York drafts. These payments were not made known to any one else. On November 30th the company was organized known as the Cuyahoga Steamship Company. Books were opened for the subscription of stock, and the original subscribers to the corporation books were as follows: William A. Hawgood, 53 shares; Arthur H. Hawgood, 53

shares; Sheldon Parks, 100 shares; Abraham Stearn, 20 shares; Clarence R. Bissell, 5 shares.

At the first meeting held December 1, 1906, a resolution was passed to pay William A. Hawgood and Arthur H. Hawgood $4,200 for valuable services to the company in disbursing the six cash payments on account of the steamer during the construction, and also for looking after the construction of the steamer, and for services to the company in securing the option and making the contract. The meeting proceeded to the election of the directors, and payments were authorized to be made to Messrs. Parks, Stocker, and others for services in selling the capital stock of the company. The Messrs. Hawgood presented to the meeting a list of the names of those who had subscribed to the so-called subscription agreement, aggregating $210,000, and they requested the capital stock of the company, when the same shall have been fully paid, should be issued to the persons named in the list with the amounts set opposite their names. At this time the so-called subscribers had paid to W. A. Hawgood & Co. $116,850, and Hawgood & Co. had paid to the Shipbuilding Company $96,600, and within five days thereafter paid the further sum to the Shipbuilding Company of $25,000.

It appears from the record that within a year previous to May 16, 1906, William A. Hawgood and Arthur H. Hawgood had assisted in the promotion of four separate corporations, to each of which the American Shipbuilding Company had conveyed a vessel, for each one of which the Hawgoods had obtained an option and then a contract, as trustees, pursuant to which the vessels were constructed, and in each of these cases a secret commission was paid to the Hawgoods.

The steamer named in the contract in this case, that is, the Sheldon Parks, was transferred by the American Shipbuilding Company to the Cuyahoga Steamship Company in April, 1907, and the bonds of the Cuyahoga Steamship Company were received by the American Shipbuilding Company on the same date.

It also appears from the record that James C. Wallace, the president of the American Shipbuilding Company, when called as a witness in another suit, did not remember whether the American Shipbuilding Company had made any payments to the Hawgoods between October 1, 1906, and December 26, 1907. It also appears in the record that during this period some $85,000 was paid by the Shipbuilding Company to the Hawgoods. It further appears that the company remained practically under the control of the Hawgoods until the spring of 1911, and that the Commonwealth Steamship Company, as successor to the Cuyahoga Steamship Company, acquired all the rights, choses in action, and assets of the Cuyahoga Steamship Company in the spring of 1911; that in September, 1911, the Commonwealth Steamship Company secured knowledge of the payment of this commission and tendered back the vessel. It further appears that the Sheldon Parks was in a thoroughly first-class condition and had been carefully cared for.

### Statement of Facts—8,215.

The facts in this case are very similar to the statement of facts in No. 8,214. The prospectuses were quite similar, as were the so-called subscription agreements. When all but $75,000 had been signed for on these so-called subscription agreements, James C. Wallace, president of the defendant company, subscribed, as trustee, for the remaining $75,000. This stock was afterwards sold to other parties, and the amount of the subscription paid by James C. Wallace, trustee, was paid directly into the treasury of the American Shipbuilding Company. Calls for stock were sent out by Henry A. Hawgood, trustee. They requested the subscribers to make the checks payable to Henry A. Hawgood, trustee of the Milwaukee Steamship Company. There was a promotion expense of $8,000 paid to the Hawgoods and to J. Q. Riddle and Sheldon Parks. About September, 1905, Henry A. Hawgood received an option for the construction of a vessel in the sum of $410,000, and the Shipbuilding Company agreed to pay Henry A. Hawgood the sum of $20,000 if he should procure a contract on the terms named in the option. The Shipbuilding Company later agreed to pay William A. Hawgood and Arthur H.

Hawgood $2,500 for their aid in the same matter. These payments were not made known to other persons. The prospectuses to which the so-called subscription agreements were attached were circulated and the agreements were signed to the extent of $205,000. The contract was signed on October 21, 1905, and provided for the construction of the steamer J. Q. Riddle at the price of $410,000. On November 1, 1905, the commissions were paid to the Hawgoods, the voucher bearing the notation "to amount as agreed between yourselves and President Wallace." Henry A. Hawgood died April 3, 1906. Arthur H. Hawgood took his place as trustee. On April 10, 1906, the Milwaukee Steamship Company was incorporated with a capital stock of $205,-000. The organization meeting was held July 27, 1906. The subscription list and record book was signed as follows: Estate of H. A. Hawgood, by Arthur H. Hawgood, executor, 300 shares; Arthur H. Hawgood, 10 shares; Sheldon Parks, 50 shares; Eliza M. Hawgood, 10 shares; William A. Hawgood, 10 shares; J. Q. Riddle, 50 shares; H. B. Hawgood, 5 shares. Each of the stockholders paid for the shares for which they subscribed. Resolutions were passed relating to the acquisition of the boat. Calls were later made by William A. Hawgood & Co. When the vessel was completed, it was turned over to the Milwaukee Steamship Company. In March, 1911, the assets of the Milwaukee Steamship Company were turned over to the Commonwealth Steamship Company, substantially as alleged in the bill of complaint. The acts of the Shipbuilding Company, the tender of the vessel, and other details in this case correspond with the facts as set forth in case No. 8,214.

A. B. Thompson, Charles P. Hine, and Clarence R. Bissell, all of Cleveland, Ohio, for complainant.

A. C. Dustin and Homer H. McKeehan, both of Cleveland, Ohio, for defendant.

DAY, District Judge (after stating the facts as above). Cases Nos. 8,210, 8,214, and 8,215 are here considered together. The bills are in their effect the same, with the exception that in cases Nos. 8,214 and 8,215 the complainant is suing as assignee or successor in interest of the original company alleged to be defrauded by the transactions complained of in the bill. The Commonwealth Steamship Company is a company engaged in the business of operating and owning steamers on the Great Lakes; the defendant company is engaged in the business of constructing and repairing similar boats which operate on the Great Lakes, and was at the time of the transactions complained of. At the various times and occasions set forth in the bills, and as it appears from the records, William A. Hawgood, Arthur H. Hawgood, and Henry A. Hawgood, in connection with certain other persons, decided at various times to form corporations for the purpose of purchasing and operating steal freight steamers, and that this purpose was known to the defendant, and that with this knowledge the defendant agreed to pay and did pay the Hawgoods secret commissions for procuring the corporations to contract for the boats at the prices named by the Shipbuilding Company, appears from the record. Much of the evidence is conflicting, and some of it is incompetent. I have endeavored to inquire as to the real facts in the various transactions, giving due weight to all of the circumstances and to the documents involved. I have considered the form of subscription agreements, the minutes of the meetings, and calls for payments, in the light of all the circumstances of the case, together with the conduct of the various parties involved, the results of the transactions,

and the probabilities resulting therefrom. It is apparent to me that it was the plan of the Shipbuilding Company to sell the various boats, and the plan of the Hawgoods to receive the secret commissions. The direct effect of the plan was to defraud the various corporations by inducing them to pay a price for the boats which was in excess of what would have been paid had the commission not been given.

It is the claim of the complainant that any persons planning to defraud a third person, whether such third person is in existence or is a company to be formed, and such third person subsequently is defrauded, as planned by them, such third person has a remedy against those who planned the fraud, regardless of the number of intervening instrumentalities which they used, and regardless of the form of contracts or resolutions which they procured to be signed or adopted.

It is the claim of the defendant that, if any wrong was perpetrated, it was perpetrated upon the individuals associated with the Hawgoods in the purchase of the said ships, or, in other words, the persons who signed the original papers entitled subscription agreements, and the right of action, if any, is in those individuals, and not in the corporation.

The question was raised upon argument and in the brief filed by the defendant as to the assignability of the rights of the original companies. This question is involved in cases 8,214 and 8,215. The question is this: Were the rights of the steamship companies, as originally formed, which are now relied upon by complainant, of a nature to be assigned?

In case No. 8,215, the Milwaukee Steamship Company was the company originally formed, and in case No. 8,214, the Cuyahoga Steamship Company was the company originally formed. When these cases were considered on demurrer, I held that these rights were assignable, and I see no reason to hold otherwise at this time.

It is evident from a careful consideration of the various prospectuses and the so-called subscription agreements attached thereto, the attendant conduct of the parties, and their future actions, that the parties who signed the papers entitled subscription agreements expected ultimately to receive stock in a corporation to be formed. They expected to incur the limited liability of a stockholder; they did not expect to enter into or incur a larger or more extended obligation or liability. The prospectuses designated William A. Hawgood & Co. as agents for the companies to be formed, and the plain meaning conveyed to a subscriber from reading the prospectuses and agreements would be that the Hawgoods were in reality promoters and later were to be agents for the corporations. When the signers to the so-called subscription agreements paid in their money for the first call to the firm of William A. Hawgood & Co., before the incorporation of the various companies, they paid it as prospective subscribers for the benefit of the companies. Machen on Corporations, § 255. The later calls made by the firm were made for the company, and the fund so paid to the Hawgood firm was impressed with a trust in favor of the corporations. It cannot be said that any subscriber seriously thought that he was agreeing to buy stock from the Hawgoods, as the minutes

of the corporation might indicate; but he must reasonably have considered himself as a subscriber of stock in a projected corporation. This was, evidently, the construction placed upon the so-called subscription agreement by the parties themselves, as no syndicate agreement appears; and the corporate existence was at all times relied upon as the dominant instrumentality which would ultimately accomplish the purpose of the undertakings.

The contracts with the Shipbuilding Company were signed by William A. Hawgood and Arthur H. Hawgood, trustees. The record shows that the president of the American Shipbuilding Company must have known in each instance that a corporation was to be formed. This is apparent from the testimony of the Hawgoods, the conduct of James C. Wallace, president of the Shipbuilding Company, and evidence of similar transactions both before and after the facts complained of in each particular instance. The Hawgoods, at the time the contracts were signed with the American Shipbuilding Company, were the promoters of the various steamship companies. They intended to and did bring about the incorporation and organization of a corporation. They brought together the persons who became interested in the enterprise. They aided in procuring subscribers, and set in motion the machinery which led to the formation of the corporation itself. Such conduct made them promoters under the definition of a promoter in the case of Dickerman v. Northern Trust Co., 176 U. S. 181, at page 204, 20 Sup. Ct. 311, 44 L. Ed. 423. The Hawgoods acquired an option on the different boats. They were largely instrumental in forming the plan of creating corporations to acquire these boats and to use the money of other individuals to obtain this property. They later organized the companies, selected the incorporators. They were in power and were the dominant minds in the very birth of these steamship companies. They were fiduciaries from the inception of the enterprise, and were recognized in law as occupying a fiduciary relationship, and in the conduct of modern business as promoters occupying such a relationship, which every reasonable inference indicates was known to James C. Wallace, president of the American Shipbuilding Company, the defendant corporation, which paid these gentlemen commissions for their services in obtaining the contracts for the boats with the various companies.

The record does not disclose that these commissions were made known to any one.

The resolutions passed by the original stockholders and the original directors in each instance were passed with no knowledge of any original stockholders, other than the Hawgoods, and with no knowledge of any original director other than the Hawgoods, that these commissions had been paid. At these meetings the contracts were transferred from the Hawgoods and their associates to the various corporations. Whether or not it was the transfer of the boats or stock in the corporations and the original associates of the Hawgoods were the nominees, or whether the corporations directly acquired the boats from the Shipbuilding Company, makes but little difference. Whether we consider the original associates of the Hawgoods as stockholders from an equi-

table standpoint or not, in any event the original subscribers to the subscription records in the first instance were innocent of any knowledge of the transactions complained of. As promoters, the Hawgoods stood in a fiduciary relationship to the corporation. Yeiser v. United States Board & Paper Co. (C. C. A. 6) 107 Fed. 340, 46 C. C. A. 567, 52 L. R. A. 724; Central Trust Co. v. East Tennessee Land Co. (C. C.) 116 Fed. 743; Erlanger v. New Sombrero Phosphate Co., 3 App. Cas. 1218; Bagnall v. Carlton, 6 Ch. Div. 371; Chandler v. Bacon (C. C.) 30 Fed. 583; Cortez Co. v. Thannhauser (C. C.) 45 Fed. 730; South Joplin Land Co. v. Case, 104 Mo. 572, 16 S. W. 390; Pittsburg Mining Co. v. Spooner, 74 Wis. 307, 42 N. W. 259, 17 Am. St. Rep. 149.

Defendant contends that the Hawgoods, as a matter of law, cannot be trustees for an unborn corporation, and that they must therefore be trustees for their so-called associates, who were the beneficiaries of the trust and had certain rights therein whereby the Hawgoods and said associates constituted a syndicate which owned an interest in the vessel prior to the organization of the corporation, and which they turned into a corporation for its capital stock.

The Hawgoods, as promoters, occupied a fiduciary relation to the unborn corporation, and as it is said in 2 Washburn on Real Property (3d Ed.) p. 193:

"A trust may be valid and effectual where a trustee is named, although the cestui que trust may not then be in esse, provided such cestui que trust subsequently came into being."

The Hawgoods, as promoters, organized these steamship companies, and while in control of the machinery, so that these companies could not act independently, they caused them to take over property, over which they had control, at a profit to themselves, which they did not disclose, and at these times they were stockholders and subscribers to the capital stock; in fact, all the stockholders and subscribers to the capital stock who then had an interest in the company, and who then had not been fully advised and had not assented to the transaction.

Under these circumstances, the company has the right of action which it asserts in these cases. Erlanger v. New Sombrero Phosphate Co., 3 App. Cas. 1218; Gluckstein v. Barnes, L. R. App. Cas. 240; Bagnall v. Carlton, L. R. Chan. Div. vol. 6, p. 371; Arnold v. Searing, 73 N. J. Eq. 262, 61 Atl. 831; Walker v. Pike County Land Co., 139 Fed. 609, 71 C. C. A. 593.

No matter what form the transactions assumed, the real question is what in equity was the result of the actions of the parties concerned.

In the case at bar it is contended that the complainant is entitled to rescind first, because there was concealment from the equitable stockholders, and, secondly, because of the concealment from the actual stockholders; all of the parties being in a sense parties to the transactions complained of.

It is likewise contended by the defendant that the stockholders have been injured in their individual capacity, but not in their corporate

capacity, and because some of the stockholders have disposed of their stock that it would be inequitable to permit the corporation to recover.

This very situation is discussed by Chancellor Pitney (now Justice Pitney) in Bigelow v. Old Dominion Copper Co., 84 N. J. Eq. 457, 71 Atl. 153. In the opinion, he disposes of this proposition in the following language:

"It is, as I take it, likewise erroneous to treat the nonassenting stockholders as if they were damnified in their individual capacity merely, rather than in their property rights. And equally erroneous to say that, because no member of the syndicate and no original or subsequent stockholder is here complaining about any injury to their rights, the transaction is not open to question. Their successors in property interest are here, in the form of the company; the former stockholders may have recouped their individual damnum, or even turned it to a profit, by selling out their stock in the market that Mr. Bigelow created."

The defendant relies largely upon the case of Old Dominion Copper Mining & Smelting Co. v. Lewisohn, 210 U. S. 206, 28 Sup. Ct. 634, 52 L. Ed. 1025. If this authority applies to the cases under consideration, it is of course controlling.

In considering this case it must be borne in mind that in the cases before us the Hawgoods, as promoters, secured secret commissions entirely unknown to any one but themselves and the defendant company; unknown alike to the other directors of the corporation, and to the other stockholders; that at the time these commissions were received there were other innocent persons who had subscribed to the capital stock of the various companies.

In the case at bar all of the stockholders, except the Hawgoods, the persons who signed the subscriptions to the stock after the books were opened for subscriptions, prior to making of the contracts, and those who signed later, were ignorant of the commissions paid to the Hawgoods. At the first meeting of each company, taking the companies as they were constituted, all of the stockholders and all of the directors, with the exception of the Hawgoods, knew nothing of the transactions complained of. If the corporations were bound in such a manner as to place their action past reconsideration or rescission they must have been bound without the majority of the stockholders or directors being in possession of the facts upon which the transaction was based.

As I have stated, the defendant relies largely upon the case of Old Dominion Copper Mining & Smelting Co. v. Lewisohn, 210 U. S. 206, 28 Sup. Ct. 634, 52 L. Ed. 1025. This was a bill brought in equity by the petitioner to rescind a sale to it of certain mining rights and land by the defendants' testator, or in the alternative to recover damages for the sale. The bill was first demurred to and the demurrer sustained in (C. C.) 136 Fed. 915. The opinion is written by Judge Lacombe, and the facts are stated in that case.

It appears that the deceased, Leonard Lewisohn, and one Albert S. Bigelow, were the promoters of the complainant company and caused it to be organized under the laws of New Jersey on July 8, 1895, by seven persons selected and employed for said purpose, none of whom had any actual interest in the corporation, or acted in the formation

thereof other than as the representative and agent of the promoters. Forty shares were nominally subscribed and paid for by these persons, but, in fact, all of said subscriptions were paid for the benefit and at the request of Bigelow and Lewisohn, and each subscription was paid for by them. The company having been organized, Lewisohn and Bigelow became directors and Bigelow the president of the company. Prior to this time they had become the owners of several mining claims and a parcel of real estate in Arizona, which were worth, according to the allegations of the bill, not more than $5,000. They held a directors' meeting attended by themselves and two of their dummy directors, and sold and conveyed to the corporation the mining claims and real estate for 30,000 shares of the capital stock of the par value of $25 a share. Later on, at times not specified, additional shares of the capital stock (to the amount of 20,000) were from time to time offered and sold to the public at par. The prayer of the original bill was that the sale of the mining stock and the real estate be rescinded and the property reconveyed and the shares of stock returned and an accounting had therefor, or that in the alternative that the court would award damages to the complainant. Judge Lacombe said:

"Ordinarily, when a director or promoter contracts to sell property to his corporation, the corporation not being independently represented, it may rescind the contract, upon the theory, of course, that the relation between the parties is fiduciary, and that the other stockholders and subscribers to the stock are to be protected against an abuse of trust. But where there are no other stockholders nor subscribers, there is no one who is deceived, no stockholder or subscriber who is defrauded, since all the profit put into one pocket by the 'faithless' directors is taken out of their other pocket as the sole stockholders."

And it is finally held by Judge Lacombe that in such a case the rule prohibiting persons in a fiduciary relation from contracting for their own advantage in the name of their beneficiaries had no application, and the demurrer was sustained. This same case later reached the Circuit Court of Appeals for the Second Circuit. The bill was then amended, though it was practically the same as the bill passed upon by Judge Lacombe, and the Circuit Court of Appeals in a per curiam opinion sustained the demurrer, and the court says:

"The fundamental difficulty with the bill is that it fails to state any facts showing that the complainant was in any way injured or defrauded by the transactions complained of. At the time of the transfer by Bigelow and Lewisohn to the company, Bigelow and Lewisohn and their representatives owned the entire issue of stock of the corporation. The sale by them to the corporation was, in effect, a sale by them to Bigelow and Lewisohn. A corporation can only act through the human beings who compose it. It cannot be deceived or defrauded, unless its stockholders and directors are deceived or defrauded. The corporation knew all that Bigelow and Lewisohn knew, and no one of the original parties to the transfer was defrauded by the exchange of the stock controlled by Bigelow and Lewisohn for the real estate controlled by them. * * * The stockholders, apparently, have no complaint. At least they have not propounded any. Indeed, it is not easy to see how a purchaser, who paid $25 per share, could be defrauded, in view of the allegation of the bill that 'the shares of this corporation so issued in payment for the property sold to it as aforesaid were at the time of the fair market value of twenty-five (25) dollars each, and continued for a long time thereafter to be of such or greater value.' It is enough, however, that this is a stockhold-

ers' action. The subscribers for the 20,000 shares subsequently issued were not deceived. They asked for no statement and received none. They got what they purchased and are not complainants here."

This case reached the Supreme Court of the United States and is reported in 210 U. S. 206, 28 Sup. Ct. 634, 52 L. Ed. 1025. The opinion is written by Justice Holmes. The facts are fully stated in the opinion. The learned justice says:

"The argument for the petitioner is that all would admit that the promoters (assuming the English phrase to be well applied) stood in a fiduciary relation to it, if, when the transaction took place, there were members who were not informed of the profits made and who did not acquiesce, and that the same obligation of good faith extends down to the time of the later subscriptions, which it was the promoters' plan to obtain."

This contention is answered in the following language:

"The difficulty that meets the petitioner at the outset is that it has assented to the transaction with the full knowledge of the facts. It is said to be sure that on September 18th, when the shares were issued to the sellers, there were already subscribers to the 20,000 shares that the public took. But this does not appear from the bill, unless it should be inferred from the ambiguous statement that on that day it was voted to issue those shares 'to persons who had subscribed therefor,' upon receiving payment, and that the shares 'were thereafter duly issued to said persons,' etc. The words 'had subscribed' may refer to the time of issue and be equivalent to 'should have subscribed' or may refer to an already past event. But that hardly matters. The contract had been made and the property delivered on July 11th and 12th, when Bigelow, Lewisohn, and some other members of the syndicate held all the outstanding stock, and it is alleged in terms that the sales were consummated before the vote of July 18th to offer the stock to the public had been passed.

"At the time of the sale to the plaintiff, then, there was no wrong done to any one. Bigelow, Lewisohn, and their syndicate were on both sides of the bargain, and they might issue to themselves as much stock in their corporation as they liked in exchange for their conveyance of their land. * * *

"If there had been innocent members at the time of the sale, the fact that there were also guilty ones would not prevent a recovery, and even might not be sufficient reason for requiring all the guilty members to be joined as defendants in order to avoid a manifest injustice. Stockton v. Anderson, 40 N. J. Eq. 486 [4 Atl. 642]. The same principle is thought to apply when innocent members are brought in later under a scheme. But it is obvious that this answer falls back upon the technical diversity between the corporation and its members, which the business point of view is supposed to transcend, as it must, in order to avoid the objection that the corporation has assented to the sale with full notice of the facts. It is mainly on this diversity that the answer to the objection of injustice is based in New Sombrero Phosphate Co. v. Erlanger, 5 Ch. D. 73, 114, 122."

The court further says:

"But all the members were engaged in the plan of buying for less and selling to the corporation for more, and were subject to whatever equity the corporation has against Bigelow and the estate of Lewisohn."

Considering the rights of the purchasers of the 20,000 shares sold to the public, the court says:

"And this means that two-fifteenths of the stock of the corporation, the 20,000 shares sold to the public, are to be allowed to use the name of the corporation to assert rights against Lewisohn's estate that will inure to the benefit of thirteen-fifteenths of the stock that are totally without claim. It seems to us that the practical objection is as strong as that arising if we adhere to the law. * * *

"On the other hand, if we should undertake to look through fiction to facts, it appears to us that substantial justice would not be accomplished; but rather a great injustice done, if the corporation were allowed to disregard its previous assent in order to charge a single member with the whole results as a transaction to which thirteen-fifteenths of the stock were parties, for the benefit of the guilty, if there was guilt in any one, and the innocent alike. We decide only what is necessary. We express no opinion as to whether the defendant properly is called a promoter, or whether the plaintiff has been guilty of laches, or whether a remedy can be had for a part of a single transaction in the form in which it is sought, or whether there was any personal claim on the part of the innocent subscribers, or as to any other question than that which we have discussed."

The court then refers to Erlanger v. New Sombero Phosphate Co., 3 App. Cas. 1218, affirming s. c., 5 Ch. D. 73, and states:

"There, to be sure, a syndicate had made an agreement to sell, at a profit, to a company to be got up by the sellers. But the company, at the first stage, was made up mainly of outsiders, some of them instruments of the sellers, but innocent instruments, and, according to Lord Cairns, the contract was provisional on the shares being taken and the company formed. There never was a moment when the company had assented with knowledge of the facts. The shares, with perhaps one exception, all were taken by subscribers ignorant of the facts (5 Ch. D. 113), and the contracts seemed to have reached forward to the moment when they subscribed. As it is put in 2 Morawetz, Corp. (2d Ed.) par. 292, there was really no company till the shares were issued. Here thirteen-fifteenths of the stock had been taken by the syndicate, the corporation was in full life and had assented to the sale with knowledge of the facts before an outsider joined. There most of the syndicate were strangers to the corporation, yet all were joined as defendants. Here the members of the syndicate, although members of the corporation, are not joined, and it is sought to throw the burden of their act upon the single one."

The court then refers to Yeiser v. United States Board & Paper Co., 107 Fed. 340, 46 C. C. A. 567, 52 L. R. A. 724, another case that was relied upon, and says that:

"The transaction equally was carried through after innocent subscribers had paid for stock."

To ascertain just what application the Lewisohn Case has to the cases at bar, it is necessary to carefully consider the Lewisohn Case and the cases referred to in the opinion in reference to the facts of the case at bar. Without deciding whether or not the subscribers to the so-called articles of agreement were in equity stockholders, it nevertheless appears from the record that at the meetings there were in every instance three other stockholders who had subscribed for stock and were regular stockholders who were innocent of the transactions of which the Hawgoods had knowledge.

In the Lewisohn Case, the corporation was bound by its action, because at the meeting which adopted the contract there were no stockholders and no subscribers at that time who were deceived, and no stockholder or subscriber was defrauded. In the case at bar, the original subscribers to the stock on the record books of the company, other than the Hawgoods, were deceived. In the Lewisohn Case, had the contract been rescinded, thirteen-fifteenths of the stock held by parties having the knowledge of the transaction would benefit. In

the case at bar the only parties having knowledge of the transactions complained of who would benefit would be the Hawgoods.

The doctrine is recognized in the Lewisohn Case that:

"If there had been innocent members at the time of the sale, the fact that there were also guilty ones would not prevent a recovery, and even might not be a sufficient reason for requiring all the guilty members to be joined as defendants."

In the Erlanger Case, which is cited with approval in the Lewisohn Case, the company had never assented with the knowledge of the facts, and in the case at bar the company had never assented with the knowledge of the facts. The case of Yeiser v. United States Board & Paper Co., 107 Fed. 340, 46 C. C. A. 567, 52 L. R. A. 724, decided by the Circuit Court of Appeals for the Sixth Circuit, is not questioned in the Lewisohn opinion, and in that case, as in the case at bar, they were innocent subscribers.

It is quite apparent that, in order for the corporation to be bound at any stage of the proceedings, it must have knowledge of the facts. It cannot be said that the guilty directors or promoters, acting in connection with other directors or stockholders, who had no knowledge of the transactions complained of, could bind the corporation.

It is contended by the defendant that it would be unjust if rescission were granted to allow the corporation to recover the fund which had been paid by the defendant to the Hawgoods. Taking the view that the Hawgoods were promoters, this contention loses its force. The Hawgoods, to the extent to which they are stockholders, which I think was stated in argument amounted to some 12 per cent. or 13 per cent. in all the cases involved, will be benefited by the rescission of these contracts. However, relief to the innocent parties concerned will not be refused because as an incidental result the Hawgoods would be unjustly benefited. Thompson on Corporations, § 110; Morawetz on Corporations, § 294.

Brewster v. Hatch, 122 N. Y. 349, 25 N. E. 505, 19 Am. St. Rep. 498, is a case somewhat similar to the cases here under consideration. A motion to elect was filed. This motion was sustained, and the plaintiff elected to prosecute an action for the benefit of the corporation. The opinion does not indicate that, if the plaintiff had elected to prosecute the action in the name of the corporation, such action would not have been sustained. The facts of the case show that the subscribers had an interest in the property before the company was incorporated, and the wrong done by Brown consisting in Brown, who acted in a fiduciary capacity to the subscribers, taking a secret profit from the persons who were jointly interested with him as owners of the property before the incorporation of the company.

A number of other cases have been cited by defendant in support of the doctrine that the corporation itself cannot maintain its action for rescission, but the action should properly be brought by one of the original associates of the Hawgoods. Taking the view of the case which I do, it is not necessary to comment upon these decisions; for, if the Hawgoods were promoters and deceived the original directors of the corporation, and in that manner deceived the corporation, such

action would give the corporation itself the right to maintain the various actions here considered. Their relation of promoters created a fiduciary relation between the various corporations known as the steamship companies, which required the Hawgoods to exercise the utmost good faith. The exercise of such duty prevented them from representing the Shipbuilding Company in the same transaction in which they represented the other parties concerned. Inasmuch as the Hawgoods endeavored to represent both the vendor, the Shipbuilding Company, and the vendee, the corporation to be formed, such action was a fraud upon these companies, and the steamship companies, by acting promptly, could rescind the contract. The cases bearing this doctrine I have considered at some length in the memorandum opinion given on the hearing on demurrer in these several cases, and I do not think it necessary to again refer to them at this time. The record established that there was a secret payment by one party to a contract to the agent of another contracting party, with knowledge of the agency.

Rescission is the only adequate remedy upon the facts as presented in the records before me. To refuse rescission would be to encourage fraud. The payment of damages would be an encouragement of such illegal practices in the future, were rescission refused in cases where one party influences the action of another's agent, trustee, or promoter. By the payment of a money consideration the party so influenced by the other party's fiduciary would have a large chance of loss if the courts would not set aside such transactions, when discovered. The record does not indicate that the Shipbuilding Company innocently paid the commissions to the Hawgoods under the belief that they would later make these payments known. In any event, the payments were not disclosed by the Shipbuilding Company nor by the Hawgoods. The receipt of the payments was a breach of trust by the Hawgoods as promoters, and, under the circumstances of the case, the payment of the Shipbuilding Company was a fraudulent payment.

Being of the opinion that the case of Old Dominion Copper & Mining Co. v. Lewisohn, 210 U. S. 206, 28 Sup. Ct. 634, 52 L. Ed. 1025, is not controlling on the facts of the cases here before the court, it is important to consider the case of Yeiser v. United States Board & Paper Co., 107 Fed. 340, 46 C. C. A. 567, 52 L. R. A. 724. This case was decided by the Circuit Court of Appeals for this circuit, consisting at the time of Judges Lurton and Day (now on the Supreme Bench) and Judge Severens. It plainly and decisively fixes the law in this jurisdiction in reference to the status and duties of promoters. Judge Severens, in delivering the opinion of the court, said in part:

"It is a well-settled principle of equity that those who participate in bringing about the organization of an incorporated company, and in getting it in condition for transacting the business for which it is organized, assume the obligations of a trust towards the company and those who shall be invited to come into the enterprise as stockholders and share in its fortunes. The latter have the right to rely on the good faith and fair dealing of those who have promoted the company, and to assume that they have not perverted the organization by secret means to the accomplishment of selfish purposes, and the destruction of the equality of rights which, in the absence of some known

modification, all the shareholders are entitled to enjoy. Indeed, some of the decided cases hold a wider doctrine, and declare that, whether the promoter becomes a stockholder or not, he owes a like duty to those who became such, and cannot by covert manipulation of the company, while it is under his control, and without the faculty of acting for itself, take a personal profit from his dealings with it. The recognition of a fiduciary relation in such circumstances is merely for the application of a familiar principle of equity, which fastens a trust upon one who has such power over another and his affairs as to give the former an opportunity to make personal gains in his dealings with them.

"The reasons for the enforcement of that principle in such cases as this are obvious. Without it there is nothing to hinder the concoction of schemes which the reports of decisions show are becoming quite too frequent in recent years, during which corporations have so greatly multiplied, whereby one may take an option or conditional contract for the purchase of property, and then turn it over, at a profit to himself, to a corporation to be organized, and be under his own control for a sufficient time to enable him to realize the fruits of his enterprise. Unless the promoter of the company is restrained by the obligations of a duty which prevents him from bringing the consequences which are liable to result to others who may be led into danger, he may practice such schemes with impunity. Of course, these observations do not apply to a case where the corporation, having knowledge of the facts and freedom of action, consents to a contract proposed by another, even though he may be a stockholder or a director. The corporation could not in such case complain, nor could a stockholder, if there had been no actually fraudulent purpose towards him. In the present case, while there is some conflict of testimony in the minor details, there is really no room for dispute in regard to the controlling facts.

"It is clear that the purpose to organize a corporation, if it should be purchased, was formed in the beginning. The option to purchase the property was not taken with a view to the use of it by the parties to whom the option was given. The option was renewed and kept alive while the corporation was being organized, and as soon as form was given to the latter, so that it was supposed to be competent to act, and its board of directors had formally accepted the proposition of Browne and Stuart to sell the mill to the company, and all things had been shaped to a definite assurance that the sale to the company would go through, and there were sufficient means secured to pay for it, the bargain with the Leonard Company was closed, and the title to the property was conveyed directly from the Leonard Company to the company which Browne and Stuart and their associates had brought into existence.

"When on August 3, 1896, Browne and Stuart made their proposition to sell the mill to their company, and they and their co-operating associates, acting as the board of directors, accepted it for the company, the company was completed in fetters. While it was made to be a purchaser, it was dominated by the seller. It had no organ for seeing, hearing, or even knowing what was going on. Its whole constituency was engaged in bringing about the sale for the sellers. We have on several occasions held that where one who assumes to act as the agent of another in a given transaction is really acting as the agent of a third person, or in behalf of some scheme of his own, his apparent principal, having no knowledge of such alien purpose, is not bound by such pretended agent's acts, nor by any notice or knowledge of facts which such agent had at the time the transaction was going forward. Thomson-Houston Electric Co. v. Capitol Electric Co., 12 C. C. A. 643, 65 Fed. 341; Wilson v. Pauly, 18 C. C. A. 475, 72 Fed. 129, 134; Louisville Trust Co. v. Louisville N. A. & C. R. Co., 22 C. C. A. 378, 75 Fed. 433, 469. And see Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977; Innerarity v. Bank, 139 Mass. 332, 1 N. E. 282, 52 Am. Rep. 710. This rule is supported by still stronger reasons where the principal is in such condition that it can by no possibility either learn the facts or have any judgment to form its own course with regard to them. * * *

"In this country the courts have accepted the essential principle laid down

in the English cases, and hold, with scarcely any variation, to the doctrine that the promoter of a company stands in the relation of a trustee to it, and those who become subscribers to its stock, so long as he retains the power of control over it. There is some difference of opinion, as there is in the English cases, in regard to the time when he becomes such promoter, within the meaning and operation of the rule. Some courts are of opinion that he is chargeable with the duties of a trust when he enters upon the execution of the scheme which is intended to result in the transfer of the property to a company to be organized and controlled by him. All, however, agree that he comes within the rule when he begins to organize the company, and fairly, and in such a way as that those having independent charge of the company, as well as those who are induced to become subscribers to its stock, may be fully advised of the relation he bears to the property which he proposes to sell, in like manner as one who assumes to act as the agent of another in the purchase of property. We refer to a few of the well-considered cases in this country, which support what we regard as the doctrine settled upon sound reason: Brewster v. Hatch, 122 N. Y. 349, 25 N. E. 505, 19 Am. St. Rep. 498; Land Co. v. Case, 104 Mo. 572, 16 S. W. 390; Hebgen v. Koeffler, 97 Wis. 313, 72 N. W. 745; Oil Co. v. Densmore, 64 Pa. 43; Hayward v. Leeson, 176 Mass. 310, 57 N. E. 656, 49 L. R. A. 725; Burbank v. Dennis, 101 Cal. 90, 35 Pac. 444; Stove Co. v. Wilcox, 64 Conn. 101, 29 Atl. 303, 25 L. R. A. 90, 42 Am. St. Rep. 159. The particular subject does not seem to have been before the Supreme Court of the United States for consideration, but there have been at least two decisions at the circuit, and they are in harmony with the views we have expressed. Chandler v. Bacon (C. C.) 30 Fed. 538, per Colt, C. J.; Cortez Co. v. Thannhauser (C. C.) 45 Fed. 730, per Wallace, C. J.

"The company, as well as the stockholders, are entitled to the benefit of the independent judgment of the trustee in regard to the value of the property to be purchased, and the price to be paid, as well as its fitness for the intended use. It is said that the property was worth what the company paid for it, and is adapted to the company's requirements. It happens so. But this in no manner affects the operation of the rule. The benefit of the purchase by Browne and Stuart inured to the company. In the present instance the conveyance was with covenants of warranty by the Leonard Company, and the price which that company received would seriously affect the measure of the liability of the vendors by reason of those covenants."

In the cases under consideration it is clear that the Hawgoods proposed to organize a corporation to take the boats; that the options were taken with that end in view. Every one connected with the enterprises, except the Hawgoods, and the defendant company, understood the best prices at which the boats could be purchased were the prices named in the options. No one else understood that the Hawgoods were to receive any profit or commission from the defendant. At the inception of the plans, when the preliminary steps were taken to organize the companies, the fiduciary relations of the Hawgoods to the projected companies had their origin. When the charters were taken out, the Hawgoods had control of the situation, and with this power in their hands they induced the corporation to adopt the contracts, without declaring to the other parties concerned—stockholders and directors—that they had received any commission. Under this situation the bonds were issued. The boats were later delivered directly to the companies. When the bonds were issued—and these bonds in each particular instance constituted a large part of the consideration for the purchase price of the boats—the parties supposed that the Hawgoods were acting in the interest of the corporations.

In connection with the construction of the "Abraham Stearn" in

case No. 8,210, it appears that Sheldon Parks, J. Q. Riddle, and C. R. Bissell, stockholders, received commissions, and that certain of the other stockholders in the Cuyahoga Steamship Company received commissions, and also that certain other parties, including Parks and Riddle, received commissions in the Milwaukee Steamship Company. In all, there were some eight stockholders in the three companies who received 5 per cent. commissions for the sales of stock. These commissions were paid by resolution of the various boards of directors and were placed upon the minutes and records of the company, and reported at the annual stockholders' meetings. They appear to be proper promotion expenses. They had nothing whatsoever to do with the secret commissions paid by the Shipbuilding Company to the Hawgoods. These actions are brought to rescind the contracts for the payment of these secret commissions paid by the Shipbuilding Company to the Hawgoods. The commissions paid on the sale of stock had nothing to do with the transactions complained of and do not appear to have been secret, nor do they appear to have been fraudulent in any respect.

Conspiracy or fraud can seldom be proved by direct evidence. In this regard the acts of James C. Wallace and the Hawgoods clearly appeared to be the co-ordinates of each other for the consummation of the purpose of enabling the Hawgoods to receive the commissions and the American Shipbuilding Company to sell the boats.

The relief asked for in this case is one requiring the exercise of an unusual power by a court of equity. In my opinion, the transactions were fraudulent. They were known to be fraudulent by the American Shipbuilding Company and by the Hawgoods. A rescission of these contracts will place the parties in as nearly statu quo as possible. It appears that the boats were carefully handled and well cared for. If they have fallen in value, that is no serious objection to their restoration to the original vendor, as the situation which has arisen was created particularly by the acquiescence and the active participation of the Shipbuilding Company in suppressing the fact that the secret commissions were given to the promoters of the various steamship companies. Neblett v. Macfarland, 92 U. S. 104, 23 L. Ed. 471; Veazie v. Williams, 8 How. 158, 12 L. Ed. 1018.

It appears from the record that there was no laches or waiver of its rights on behalf of the company in disaffirming the contracts and tendering the boats back, when the circumstances constituting the payment of the secret commissions were discovered by the complainant.

It is accordingly ordered that the several contracts entered into by the American Shipbuilding Company for the construction of the boats be rescinded and canceled; that the unpaid bonds made and delivered by the complainant to the defendant (or by the companies to whose rights the complainant has succeeded) be delivered by the defendant to the complainant; that the several steamers mentioned in each respective suit be delivered by the complainant to the defendant; that the complainant account to the defendant for the sum justly due from the complainant to the defendant; that the balance of money received by the defendant from the complainant (or the companies whose in-

terests it has succeeded) be paid with interest by the defendant to the complainant; that the defendant pay to the complainant such sum of money as has been paid by the complainant by way of interest on the bonds of the complainant, or the companies to whose rights it has succeeded.

If the financial details accompanying the relief granted cannot be agreed upon by the parties to these suits, it may be necessary to have a special master appointed to make a finding as to the several amounts due between the parties to these cases.

Exceptions are granted to the defendant.